Argued and submitted October 28, 2014; resubmitted en banc December 21, 2016; portion of judgment granting post-conviction relief and remanding for new trial reversed, otherwise affirmed February 23, 2017

DANTE R'MARCUS FARMER,
*Petitioner-Respondent,*

*v.*

Jeff PREMO,
Superintendent,
Oregon State Penitentiary,
*Defendant-Appellant.*

Marion County Circuit Court
07C16834; A152447

390 P3d 1054

Paul L. Smith, Assistant Attorney General, argued the cause for appellant. On the brief were Mary H. Williams, Deputy Attorney General, Anna M. Joyce, Solicitor General, David B. Thompson, Assistant Attorney General, and Rebecca M. Johansen, Assistant Attorney General.

Hari Nam S. Khalsa filed the brief for respondent.

Before Hadlock, Chief Judge, and Armstrong, Ortega, Sercombe, Egan, DeVore, Tookey, Garrett, Flynn, DeHoog, and Shorr, Judges.

**HADLOCK, C. J.**

In this post-conviction relief case, the state[1] appeals from a judgment granting petitioner relief on a number of his claims, and remanding the case for a new trial. The state assigns error to the post-conviction court's rulings on those claims, arguing that petitioner failed to establish, as a matter of law, that he was entitled to relief on any of them. We conclude that the post-conviction court did err in its legal analysis of each of the claims on which it granted relief, and we accordingly reverse the portion of the judgment granting post-conviction relief and remanding for a new trial.

In his fourth amended petition (the petition), petitioner alleged claims of inadequate assistance of counsel, claims of direct due process violations, and a claim of prosecutorial misconduct. The post-conviction court granted relief on the basis that petitioner received inadequate assistance of counsel on the following grounds: Trial counsel failed to present a defense expert's bullet-comparison opinion at trial. Trial and appellate counsel failed to argue that certain evidence was not hearsay. Trial counsel failed to move for a continuance of a new-trial hearing and to present testimony from a witness at that hearing. Trial counsel failed to make certain objections to prosecution evidence at the new-trial hearing. Trial counsel failed to make certain constitutional objections to the new-trial hearing procedures. The post-conviction court denied relief on all other claims in the petition.

## I. HISTORICAL AND PROCEDURAL FACTS AND LEGAL FRAMEWORK

To provide a general context for the issues on appeal, we set out here the background facts relating to the claims on which the post-conviction court granted relief, as well as

---

[1] When a petitioner for post-conviction relief is imprisoned, as in this case, ORS 138.570 provides that the petition "shall name as defendant the official charged with the confinement of petitioner"; in other circumstances, the named defendant is the state. Because the post-conviction court referred to the party opposing this petition as "the state" during the proceedings and in its letter opinion, for convenience, we also refer to defendant as the state. We refer to the trial court in this post-conviction action as the post-conviction court, and the trial court in petitioner's underlying criminal trial as the trial court.

an overview of the applicable legal framework. We state the facts as the post-conviction court found them, supplemented with undisputed facts from the record.[2] In the analysis of each assignment of error, we set out additional facts, explanation, and legal principles as necessary and pertinent to resolution of the issues under consideration.

## A. *Petitioner's Criminal Trial and the Defense Strategy*

A jury convicted petitioner of murdering the victim, Monterroso. Monterroso was killed by a single gunshot to the chest. *State v. Farmer*, 210 Or App 625, 627, 152 P3d 904, *rev den*, 342 Or 645 (2007). Police arrested petitioner after his then-girlfriend, Jennifer, and her parents, Perkins and Garvin, reported to police that petitioner told them he had shot the victim. *Id.* at 635-37.

At petitioner's criminal trial, there was evidence that, on the night of the shooting, petitioner had arrived at Jennifer and Perkins's home "looking scared and 'spooked, like he [had] seen a ghost.'" *Id.* at 635 (brackets in original). Initially he told them that he had seen "'his home boy get shot,' and that he was only a few feet away when the shooter's car drove up." *Id.* Jennifer testified that petitioner told her later the same night "that he had just killed someone and threatened to kill her if she ever told anyone." She also said that he told her the next night, perhaps, "that he had been threatened and that he had to kill the victim before the victim killed him." *Id.*

Perkins testified that, about a week and a half after the shooting, petitioner had asked if he could tell her and Garvin something, and that he had confessed to the shooting, saying that it was "over a 'weed deal * * * that went bad.'" *Id.* at 635-36 (omission in original). She was shocked, did not think his story made sense, and told him as much.

Garvin was there because he was concerned about a previous incident of violence by petitioner against Jennifer,

---

[2] We set out the events that led to petitioner's arrest and prosecution in detail in our opinion on petitioner's direct appeal. *See State v. Farmer*, 210 Or App 625, 627-38, 152 P3d 904, *rev den*, 342 Or 645 (2007). The post-conviction court largely drew its factual findings concerning those events from that opinion, quoting it extensively, interlineated with its own additional findings in italics.

and intended to tell petitioner that he "'had to go.'" He "testified that [petitioner had] appeared very upset and said that 'it was either him or the other guy.'" *Id.* at 636. Garvin testified that petitioner "described the killing, saying that he walked up to the victim, who did not see him coming, and shot the victim once with a .357 that [petitioner] had gotten from a friend." *Id.* Garvin also testified that petitioner told him that he put the gun to the victim's head, and that it "'just went off.'" *Id.* Garvin asked what petitioner "was wearing at the time, and petitioner said that he was wearing a reversible blue/black coat." *Id.*

Neither Perkins nor Garvin initially believed petitioner. Perkins initially believed that petitioner was "'puffing' because he feared Garvin and he was trying to avoid being excluded" from Perkins's home. *Id.* Garvin similarly believed that the story was "just 'talk'" aimed at keeping Garvin from "kicking him out," but "out of concern for his daughter," he "also wanted to investigate the story." *Id.*

The next day, angry about seeing petitioner and Jennifer together, Garvin called the police and spoke with Detective Renna, the lead detective investigating Monterroso's murder. Garvin told Renna that petitioner "'walked up on the guy and blew him away.'" *Id.* At some point after that report, petitioner "confronted Garvin about 'ratting him out,'" and after that confrontation, Garvin "'look[ed] at it in a different light, yes. He was pretty nervous and real up-tight. So at that point I saw that this was going somewhere.'" *Id.*

Petitioner's descriptions of the murder as recounted by Jennifer, Perkins, and Garvin in some ways did not match other evidence—Monterroso was not shot in the head, the gun was no closer than 6 inches from Monterroso's chest, and no one else described a car being involved in the murder.

In addition to those confessions, the prosecution presented evidence from two other witnesses who linked petitioner to the murder. One of those witnesses, Feliu, identified petitioner on the night of the murder as a person who had been looking for Monterroso about an hour before the shooting. Feliu had attended middle school with petitioner

and had seen him around the neighborhood a few times since then, and she recognized petitioner "'the second [she saw] him.'" *Id.* at 628 (brackets in original). On the night of the murder, she gave police a description and petitioner's first name, "'Dontae.'"[3] *Id.* Two days later, she identified petitioner in a police photo line-up. *Id.* at 633.

The other witness, Muldrew, had been next to Monterroso when he was shot. He testified that he saw petitioner shoot Monterroso with a .357 revolver. *Id.* at 629. Muldrew provided a description of the shooter to police on the night of the shooting, but "[a]lthough Muldrew had seen [petitioner] a couple of times previously and knew who [petitioner] was (though only by a nickname), he did not identify [petitioner] as the perpetrator at that time." *Id.* at 633. Four days after the murder, "[i]dentifying [petitioner] by his nickname, Muldrew told Feliu that [petitioner] had killed Monterroso." *Id.* About two weeks later, he identified petitioner in a police photo line-up. *Id.*

On the night of the murder, Muldrew described the shooter to police as "about 5' 9" or 5' 10", 16 to 19 years old, skinny, with a mustache and a goatee." *Id.* at 632. He also told police that the shooter "was wearing a dark, puffy coat" that had writing on it and "black sweatpants with a white stripe down the side." *Id.* That night, Feliu also described to police the man she recognized as "Dontae," who had been looking for Monterroso earlier, as "a black male, 18 years old, medium-dark complected, 5' 9" or 5' 10", with light facial hair, and wearing a blue coat with a hood and a horizontal stripe." *Id.* at 633.

Muldrew called 9-1-1 immediately after Monterroso was shot. *Id.* at 629. At about the same time that Muldrew called 9-1-1, a woman, later identified as Thompson, also called 9-1-1. *Id.* She initially was identified by only her first name, and was not located until after the trial was over. In the call, Thompson said she had witnessed the shooting and, among other things, she described the shooter and his companion as Hispanic. *Id.* She also described the shooter

---

[3] The quoted spelling of petitioner's first name corresponds to its spelling in the caption and record of his criminal trial and direct appeal, rather than the spelling reflected in the caption of this case.

as wearing a black or blue jacket. A recording of the call was played at trial.[4]

A police officer at the scene after the murder also made statements to dispatch, which were recorded, that a witness had described a suspect who ran away from the scene as a teenaged Hispanic male. Petitioner is African American. *Id.* at 634.

Renna was told during his investigation that "'word on the street'" was that a man named Baines was involved in the shooting. *Id.* Baines and petitioner resemble each other. During an unrelated investigation of Baines, police seized a Rohm .38-special revolver from a home where he sometimes stayed. *Id.* at 637. When shown a photograph of Baines, both Feliu and Muldrew noted some resemblance to petitioner, but neither recognized him or had any idea who he was. *Id.* at 638.

At trial, to counter the defense theory that Baines could have been the shooter, the prosecution presented evidence that the Rohm revolver had been inoperable for years at the time it was seized. There was testimony from prosecution witnesses that the gun had to be repaired before it could be test fired, and that test-fired bullets from it did not match the bullet fragment recovered from Monterroso's body. *Id.* at 637-38.

A defense expert, Wong, had concluded that the Rohm revolver "likely fired" the fatal bullet, but trial counsel did not call him as a witness at trial. Trial counsel was concerned about Wong's qualifications, and, in consultation with Wong and a second expert, she opted instead to rely on testimony she elicited from the state's expert.

The defense strategy generally was to suggest that Baines or another person was the perpetrator rather than petitioner. Trial counsel's tactics included eliciting evidence that the shooter had been described as Hispanic, challenging the witness identifications of petitioner, focusing attention on the resemblance between petitioner and Baines, establishing that the gun that Baines arguably had access

---

[4] The full transcript of Thompson's 9-1-1 call is set out in our opinion in *Farmer.* 210 Or App at 629-32.

to could be the murder weapon, and questioning the motives of petitioner's ex-girlfriend and her parents.

At the conclusion of the trial, the jury deliberated for 15 hours before returning a guilty verdict. Petitioner was convicted and sentenced for murder with a firearm.

B. *Post-Judgment Motion for New Trial*

A defense investigator, De La Melena, had attempted before trial to locate the unidentified 9-1-1 caller. De La Melena was eventually able to locate Thompson and interview her, but not until after the trial had ended. *Id.* at 639. Thompson provided an affidavit in which she stated that she had been shown photographs of petitioner and that he "was definitely not the shooter" or the accomplice. *Id.* Rather than describing the shooter as Hispanic, as she had during her 9-1-1 call, she gave a description of the shooter as "a dark-complected, black male." She stated that two of the photographs she had been shown "most closely resemble[d]" the shooter. *Id.* at 639. Those two photographs were of Baines. *Id.*

Trial counsel filed a motion for new trial based on the discovery of new evidence, along with Thompson's affidavit. On the morning of the new-trial hearing, the prosecutor submitted an affidavit and police report from Detective Renna.[5] Renna's affidavit contained information from his own interview with Thompson, including potential bases for impeachment. Trial counsel objected to Renna's affidavit on several grounds and moved to strike it. The trial court admitted the affidavit over trial counsel's objections, but stated that it would focus primarily on Thompson's affidavit. At the conclusion of the hearing, the trial court ruled that it would not grant a new trial because Thompson's testimony would not be likely to change the result of a new trial.

Petitioner appealed his conviction, assigning error to the trial court's denial of his motion for new trial. We

---

[5] Renna's affidavit essentially consisted of a sworn statement that identified himself and his partner, stated the date and time of his interview with Thompson, and stated that the attached police report was true and accurate. The evidence at issue was in the attached report. References in this opinion to Renna's affidavit are to the combined affidavit and report.

affirmed his conviction and, as part of our analysis in concluding that the trial court did not abuse its discretion, we noted that petitioner had offered no evidence to dispute the information in Renna's affidavit. *Farmer*, 210 Or App at 644-45.

## C. *Applicable Legal Framework*

Criminal defendants have a constitutional right to counsel under both Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487, 493, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014).

To prevail on a claim of inadequate assistance of counsel under Article I, section 11, a petitioner must establish both "that [counsel] failed to exercise reasonable professional skill and judgment," and "that counsel's failure had a tendency to affect the result of [the] trial." *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002). When a court evaluates trial counsel's conduct to determine whether it failed to meet state constitutional standards, the court must "make every effort to" do so "from the lawyer's perspective at the time, without the distorting effects of hindsight" and must "not second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment." *Montez*, 355 Or at 7 (internal quotation marks and citations omitted).

Similar principles apply when evaluating whether trial counsel's performance failed to meet federal constitutional standards.

"To prevail on a Sixth Amendment claim regarding the ineffectiveness of counsel, a petitioner must demonstrate that his or her trial counsel's performance 'fell below an objective standard of reasonableness.' *Strickland* [*v. Washington*], 466 US [668, 688, 104 S Ct 2052 (1984)]. Appellate courts reviewing Sixth Amendment claims 'must consider the totality of the evidence before the judge or jury.' *Id.* at 695. At the end of the day, the court must evaluate the reasonableness of counsel's representation 'from counsel's perspective at the time of the alleged error and in

light of all the circumstances, and the standard of review is highly deferential.' *Kimmelman v. Morrison*, 477 US 365, 381, 106 S Ct 2574, 91 L Ed 2d 305 (1986). In doing so, we do not inquire into counsel's subjective state of mind; instead, we inquire into the objective reasonableness of counsel's performance. *Harrington v. Richter*, 562 US 86, 110, 131 S Ct 770, * * * 178 L Ed 2d 624 (2011)."

*Id.* at 7-8.

The Oregon Supreme Court has "recognized that the standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution. *Id.* at 6-7. "Under both constitutions, the defendant's right is not just to a lawyer in name only, but to a lawyer who provides adequate assistance." *Id.* at 6 (internal quotation marks omitted).

We review a post-conviction court's application of the legal standards for errors of law, and its express findings of historical fact are binding if there is evidence in the record to support them. *See Green v. Franke*, 357 Or 301, 312, 350 P3d 188 (2015) (stating standard of review). If the post-conviction court did not make findings as to all of the historical facts that are pertinent to the analysis, and the evidence would allow the court to find those facts in more than one way, we will presume that it found the facts consistently with its conclusions. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). That presumption, however, "is necessarily dependent on the trial court's application of the correct legal analysis. If the court is operating under a misunderstanding as to the applicable legal principles[,] * * * we will not infer that the court decided facts consistently with that erroneous legal construct." *State v. Ellis*, 252 Or App 382, 390, 287 P3d 1215 (2012), *rev den*, 353 Or 428 (2013).

The analysis that follows focuses on fundamental principles that govern post-conviction proceedings, as emphasized in two opinions that issued after the post-conviction court decided this case: *Montez* and *Pereida-Alba v. Coursey*, 356 Or 654, 342 P3d 70 (2015). Those cases stress that, in reviewing the adequacy of petitioner's trial

counsel, a post-conviction court must consider "the lawyer's perspective at the time," instead of viewing the lawyer's decision with the benefit of hindsight. *Montez*, 355 Or at 7. Moreover, the post-conviction court should not focus solely on the possible benefits of strategies that trial counsel did not pursue, but should instead determine "whether the strategy that defense counsel *did* employ was reasonable." *Pereida-Alba*, 356 Or at 674 (emphasis added); *see Montez*, 355 Or at 24 ("The fact that petitioner would, in retrospect, have implemented his * * * defense in one or more different ways is not a ground for post-conviction relief if counsel acted reasonably in presenting the defense that they did."). The discussion below is based on those core precepts.

## II. CLAIMS RELATED TO EVENTS DURING TRIAL

### A. *Defense Counsel's Decision Not to Call Wong as an Expert Witness*

Petitioner made an allegation, as part of an inadequate assistance of counsel claim in section 7 (1)(e) of his petition that the post-conviction court summarized as follows: "Trial [c]ounsel failed to call either Franklin Wong or Bart Reid as an expert witness to testify that a handgun * * * found in the possession of * * * Baines, was more likely than not the firearm that discharged the bullet found in the deceased." The post-conviction court granted relief on that claim, finding that Wong "would have testified that the firearm found in Baines's home was operable and * * * was 'most likely' the gun that killed Monterroso." Accordingly, the court concluded, "a reasonable attorney would have called Wong to testify as a defense expert."[6] The state assigns error to that ruling, arguing that trial counsel's decision not to call Wong as a witness was a reasonable tactical choice and that the post-conviction court erred by not giving proper

---

[6] The state argued before the post-conviction court that petitioner had failed to prove this claim as to Reid, because he produced no evidence of what Reid's opinion was, or that Reid would have provided favorable testimony at trial. The post-conviction court's letter opinion did not grant relief based on a failure to call Reid as a witness. Petitioner does not make any argument on appeal concerning Reid.

deference to that decision. Petitioner argues that the post-conviction court did not err.[7] We agree with the state.

1. *Whether the fatal bullet fragment could have been fired from the Rohm was the subject of expert testimony at trial.*

At petitioner's criminal trial, the prosecution called an Oregon State Police (OSP) forensic firearm and tool-mark examiner, Gover, as a witness to provide evidence about the bullet fragment that had been recovered from the victim's body and about the Rohm revolver and bullets test fired from it.[8] Gover had extensive training from the Bureau of Alcohol Tobacco and Firearms, including training in firearm and tool-mark examination as used in bullet comparisons. Gover explained that his training included comparing bullets known to have been fired from different firearms that were "as closely manufactured to each other as possible," and bullets known to have been fired from the same firearm. That training allows examiners to establish baselines of the most agreement possible between bullets fired from different firearms, and the level of disagreement one can expect to see with bullets fired from the same firearm.[9]

A bullet fragment was recovered from the victim's body. Investigators could not determine conclusively what

---

[7] Petitioner filed an answering brief on appeal which asserts, in response to each assignment of error, that the post-conviction court's ruling was correct, and that he relies on the court's reasoning as expressed in its letter opinion, which he quotes verbatim. He makes no further arguments.

[8] In the record and briefs, this witness's name is sometimes spelled "Grover." We use Gover throughout this opinion, making substitutions as necessary in quotations for clarity and consistency.

[9] Gover defined some of the terminology he used in describing bullet comparisons. "Class characteristics" refers to characteristics that are shared by groups of firearms—such as caliber, center or rim fire, and rifling attributes—some of which may be discerned from examining a recovered bullet and can narrow down the group of firearms that might have fired it. "Lands and grooves" are raised or incised areas that are cut by a tool as part of the rifling attributes within the barrel, and which leave reciprocally incised or raised areas on bullets that have passed through the barrel. Different models of firearms can have different numbers, widths, and direction of twist of lands and grooves.

In addition, the barrel of a particular firearm can impart microscopic striations to the bullet as it passes through, caused by tiny imperfections in the tool that created the lands and grooves in the barrel. Those striations are individual characteristics, which can in some circumstances allow a determination that a particular firearm did or did not fire a particular bullet.

caliber it was or what kind of gun had fired it. Gover noted that the bullet fragment was from a type of ammunition typically used in revolvers. When he entered data collected from the bullet fragment into a Federal Bureau of Investigation database to create a list of firearms that could have fired the bullet, there were 30 to 40 different types of firearms on the list. The list included 9mm, .380, .38, and .357 magnum caliber firearms. Among the listed possible firearms was a Rohm .38-special revolver.

Gover recounted that he test fired the Rohm revolver associated with Baines in February 2002 and he compared test-fired bullets with the fatal bullet fragment. In his opinion, the amount of "agreement" of individual characteristics "was insufficient to positively say that that bullet was fired from that gun." He explained that, in comparing the test-fired bullets from the Rohm to the fatal bullet fragment, there was some agreement of the individual characteristics, but there was also some disagreement. He concluded that the results of the comparison were inconclusive—it could not be determined whether the bullet fragment was fired from the Rohm. Gover's conclusions were confirmed by another equally trained analyst in the OSP crime laboratory.

In response to questions from trial counsel, Gover acknowledged that the test-fired bullets and the bullet fragment had agreement of all discernible class characteristics and some agreement of individual characteristics. He conceded that he could not exclude the Rohm as the murder weapon. Specifically, Gover's response to trial counsel's question was, "That is correct, it cannot be excluded." He also agreed with trial counsel's characterization of his previous testimony as being that he was "not one hundred percent certain that this was a match."

The prosecution also presented evidence that the Rohm had been inoperable at the time of the murder. The former owner, Baker, testified that it did not work the last time she tried to fire it, more than a decade before the murder. About two to three months before police seized it, Baker gave the gun to her daughter, Waller. Waller testified that it did not work and that she had not cleaned or repaired it. An OSP firearms examiner, Alessio, testified

that another criminalist had reported that the Rohm was inoperable when examined in April 2001. Alessio had also observed that the Rohm was inoperable before he repaired it in August 2001.

Before the defense case began, the prosecutor requested a hearing to determine whether Wong, who had been present at the February 2002 test firing of the Rohm, was qualified as an expert in bullet comparison. At that hearing, outside the presence of the jury, trial counsel and the prosecutor questioned Wong about his qualifications. In response to trial counsel's questions, Wong agreed that he had "extensive experience in the comparison study of bullets." He elaborated that he had worked on "over a dozen cases involving firearms," three or four of which involved bullet comparisons, during his nine years of professional experience. Wong recounted his education and experience in metallurgy and mechanical engineering, and described how they provided relevant expertise in the area of bullet comparison. On cross-examination, Wong acknowledged that he had no formal training in bullet comparison. The court ruled that Wong could testify on the subject, and noted that evidence of Wong's specific experience and training would be for the jury to weigh.

2. *Trial counsel made a tactical decision not to call her own expert.*

In advance of the post-conviction trial, trial counsel was deposed and her deposition testimony was admitted at the post-conviction trial. In that testimony, trial counsel explained that while preparing for petitioner's trial she had pursued the possibility that Baines had actually been the shooter. She had hired Wong initially as an expert in crime scene reconstruction to analyze the trajectory of the fatal bullet. After she learned of Baines and the Rohm revolver, trial counsel had Wong attend OSP's test-firing and compare the fatal bullet fragment with the test-fired bullets. Wong analyzed the bullets and concluded that the fatal bullet "was likely fired from the Rohm." Trial counsel became concerned, however, that Wong might not make a persuasive witness on that issue because he did not have an extensive background in ballistics and tool-mark identification. When

she decided that she needed someone who had more expertise in that area, trial counsel hired another expert, Reid, who was also present when the Rohm was test fired. Trial counsel's recollection was that Reid's conclusions were similar to Gover's: the results of the comparison were inconclusive, and the Rohm could not be excluded as the murder weapon.

Explaining her decision not to call either defense expert, trial counsel said that the prosecution could challenge Wong, and that "Reid was not going to be as strong as Wong." Trial counsel recalled that, consulting with Wong and Reid after Gover testified, she knew neither of them would say conclusively that the fatal bullet came from the Rohm. Although Wong would have said it was "likely," she thought that the prosecutor would attack his qualifications—which were far less extensive than Gover's—thereby damaging credibility with the jury, which would "detract from *** the strength of" the defense case. Counsel also believed that Wong ultimately would have to admit that the bullet-comparison result was inconclusive, which would essentially be a rehashing of Gover's testimony. In consultation with both of her experts, trial counsel ultimately decided not to call either of them to testify about the bullet comparison because she thought that Gover's acknowledgment on cross-examination that he could not exclude the Rohm as the murder weapon "was the best *** coming from the [s]tate's witness."

3. *Trial counsel's decision at trial not to call Wong as a witness was a reasonable tactical choice that did not reflect an absence or suspension of professional skill and judgment.*

Tactical decisions made in the course of preparing for trial must involve "a conscious choice by a lawyer either to take or to omit some action on the basis of an evaluation of the nature and complexity of the case, the likely costs and potential benefits of the contemplated action, and other factors." *Stevens v. State of Oregon*, 322 Or 101, 109, 902 P2d 1137 (1995). A lawyer's tactical decision "must be grounded on a reasonable investigation." *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001). If it is based on an appropriate

evaluation, a tactical decision is entitled to considerable deference. *Lichau*, 333 Or at 360.

The post-conviction court analyzed this claim as follows:

"When the defense hired an expert to examine the bullet fragment and the weapons seized, this Court is sure, the defense was hoping that the expert would find that the bullet fragment in question came from the gun found at the home of the other suspect, Baines. However, when the expert the defense hired found that the bullet fragment was likely fired from the gun found at Baines'[s] home * * * the defense chose not to call their expert as a witness. The defense attorney has stated that, (1) despite the expert's findings that were very favorable to the defense, she did not realize that the defense expert's findings would be that much different than the State's findings when presented at trial. Further, she decided not to call the forensic expert as a witness because the expert did not have the training and experience to withstand cross-examination. Counsel goes on to state that she hired Bart Reid as a second opinion, because Reid had better credentials. However, in her deposition she goes on to say, 'Bart Reid was not going to be as strong as Wong.' This Court misses the logic in trial counsel's analysis.

"Although tactical choices by a trial lawyer do not usually provide grounds for post-conviction relief, relief may be available if [petitioner] shows the decisions of counsel were not based on a reasonable evaluation of costs and benefits, or a reasonable evaluation of the evidence. In a cost versus benefit analysis undertaken by a reasonable attorney, a reasonable attorney would have called Wong to testify as a defense expert. Regardless of the ability of the State to impeach his credentials, even if he were impeached regarding the analysis of the bullet fragment lands and grooves, his testimony when combined with the State expert Gover's testimony would be: one expert who testified that the Rohm revolver could have been the weapon that fired the bullet that killed Monterroso and one expert who testified that the Rohm revolver was likely [the] weapon that fired the bullet that killed Monterroso. Therefore, what was the down side of calling Wong to testify?

"Further, if the credentials of the forensic expert hired by the defense, Wong, were such that the defense would not

call their expert to testify: (1) why did the defense hire this person as an expert? and (2) given the expert's opinion that the bullet fragment was likely fired from the gun found at Baines'[s] home, why did the defense not attempt to hire a more qualified defense expert to either confirm or refute the analysis of Wong, and potentially put that expert on the stand?"

(Citation omitted; ellipsis in original.)

The state argues that the post-conviction court erred in its legal analysis of trial counsel's tactical decision. We agree. In evaluating trial counsel's tactical choice, the question is not whether a reasonable attorney could have come to a different conclusion, or whether, in hindsight, the chosen tactic was successful or effective. Nor is the question whether it appears that the path not chosen, considered in isolation, would have had no "downside." *Green*, 357 Or at 314. Rather, the question is whether no attorney exercising reasonable professional skill and judgment could have made the tactical choice that trial counsel did, such that the choice reflects an absence or suspension of professional skill and judgment.

Here, trial counsel's decision was grounded in a reasonable investigation, and she weighed the likely costs and potential benefits of her chosen trial tactic. Trial counsel hired Wong at the outset of the case to reconstruct the crime scene, which is Wong's primary area of expertise. She later sought his opinion when the bullet comparison issue arose. She also decided to hire another expert with better credentials, as the case developed. Both experts were present for the test firing of the Rohm, and provided opinions on the bullet comparison. Once the state had presented Gover's testimony, including his formal training and experience in bullet comparison, trial counsel decided, in consultation with her experts, that calling Wong as a witness ran the risk of undermining the defense's credibility with the jury and detracting from the strength of the defense case. She did not call Reid, the better-qualified expert, because his testimony evidently would have added nothing to what Gover had already told the jury. In addition, there were tactical advantages in not presenting a defense expert if it might detract from the impression that the defense had

elicited testimony from the prosecution's own expert that damaged the prosecution's case. The likely costs of calling Wong as her own expert witness in that scenario would be that, although Wong would provide a more favorable bullet-comparison opinion on direct examination, he was vulnerable on cross-examination and could leave the jury with an impression that the defense was not credible and its case was weak.

In sum, trial counsel performed a reasonable investigation after which she made a conscious tactical choice following an appropriate evaluation of the likely costs and potential benefits of calling Wong as a witness to give an opinion about whether the fatal bullet had been fired from the Rohm. Her decision to rely instead on Gover's testimony that he could not rule out the Rohm as the murder weapon is the kind of tactical choice by defense counsel that is entitled to considerable deference, and does not reflect an absence or suspension of professional skill and judgment. The post-conviction court, therefore, erred in concluding that trial counsel provided inadequate assistance of counsel on that basis.[10]

The post-conviction court also concluded that trial counsel's failure to call Wong constituted inadequate assistance of counsel because Wong would have testified that the Rohm was operable at the time of the fatal shooting. The

---

[10] In disagreeing with this analysis, the dissent relies on cases in which the Supreme Court held that post-conviction relief was warranted because trial lawyers had decided not even to investigate potential witnesses or lines of defense. *Lichau*, 333 Or at 356, 360-61 (holding that lawyer conducted inadequate investigation where, despite the petitioner's repeated assertions that military documents and witnesses would create an alibi for him, the lawyer did not seek out the documentary evidence and did not attempt to contact possible alibi witnesses other than the petitioner's parents); *Stevens*, 322 Or at 109 (holding that lawyer conducted inadequate investigation in a rape case that turned on the credibility of the petitioner and the complainant, given the lawyer's "fail[ure] to interview several witnesses whose testimony might well have had bearing on the [complainant's] credibility" and who were "the first people with whom [the complainant] had contact after the alleged rape"). In this case, though, petitioner's counsel did investigate, in a way that led her to hire experts whom she hoped would bolster the defense theory that Baines may have committed the murder. Counsel's decision not to call one of those experts for fear that his weak testimony would diminish the effectiveness of the defense case, cannot be analogized to a fundamental failure to investigate.

court drew that conclusion from a portion of the report that Wong wrote for trial counsel, in which he stated:

> "The Rohm revolver was function tested by depressing the trigger and lowering the hammer by hand to slow the speed of the action. When the trigger was depressed and held, the cylinder rotated properly, the hammer was able to strike the firing pin, and the firing pin protruded from the frame. When the trigger was depressed to release the hammer and then immediately released, the trigger linkage prevented the firing pin from being contacted by the hammer. No binding or malfunction of the mechanisms was noted."

The court noted that Wong's assertion that the gun worked was consistent with testimony from Officer Santos, who had seized the gun from Waller's home. When asked if he knew whether the gun was operable when he seized it, Santos replied, "Ms. Waller indicated it was." The post-conviction court also noted that trial counsel had made a hearsay objection to that response, and found it "unusual" that defense counsel would have objected to that favorable testimony.[11]

The state argues that trial counsel could reasonably have made a strategic decision not to call Wong to testify that the Rohm was operable. According to the state,

---

[11] The state argues that we should reject as unsupported by the record the post-conviction court's factual finding that Santos testified that Waller told police that the gun was functional. The state points out that Santos was interrupted by a hearsay objection that the trial court sustained. In context, the state argues, it is clear that, had he not been interrupted by the objection, Santos would have testified that "Ms. Waller indicated it was" *not functional.* The exchange was as follows:

"[Prosecutor]: To your knowledge was that revolver functional when you retrieved it?

"[Santos]: Ms. Waller indicated it was.

"[Trial counsel]: Objection, hearsay.

"The Court: It is hearsay."

The state also asserts that other evidence shows that Waller told the police that the gun was not functional, citing Renna's testimony that a police report states that Waller told officers that the gun was broken and would not fire.

We need not resolve the issue, however, because we conclude, as discussed below, that the post-conviction court erred in granting relief on the basis that trial counsel should have called Wong as a witness even if, as the court found, "Santos testified that Waller told him that the Rohm * * * was functional when [it] was seized from Waller's home."

the evidentiary record does not support the conclusion that Wong's testimony would have been useful to petitioner's defense. The state points out that three witnesses at the criminal trial testified that the gun did not work at the time it was seized: Waller, who owned the gun, her mother, who gave her the gun, and Alessio, the OSP firearms examiner who repaired the gun so that it could be test fired. The state also argues that Wong's report is undermined by the fact that he wrote the report in March 2002, more than six months after Alessio had repaired the Rohm.

We agree with the state that trial counsel did not perform deficiently by not calling Wong to testify that the Rohm was operable. Trial counsel exercising reasonable professional skill and judgment could choose not to elicit Wong's testimony on that subject, based on concern that the disadvantages of doing so would have exceeded the advantages. The evidence would have been weak and easy to discredit if it were presented as showing that the Rohm was operable at the time of the murder, given the evidence that the Rohm had been inoperable from approximately 1989 until Alessio repaired it in August 2001. The record includes no evidence that Wong examined the gun before that repair. And Wong's testimony would not have appreciably advanced the defense case if merely directed at showing operability at the time that OSP personnel test fired it, which was not in dispute.

Santos's testimony does not aid petitioner on this issue. The post-conviction court found that Santos testified that Waller had told police that the gun was functional when they seized it, but that testimony would not have been reinforced by Wong testifying that the gun was operable six months after the date that Alessio said he had repaired it. The jury could as easily weigh Santos's testimony about what he recalled Waller having said to police against Waller's testimony at trial that the Rohm was *not* functional when police seized it, with or without Wong's testimony that the gun was operable months later, at a time when its operability was not in dispute. Thus, the presence of Santos's testimony would not have prompted all reasonable trial counsel to call Wong to testify on that latter point.

In sum, trial counsel did not perform deficiently by not calling Wong as a witness at petitioner's criminal trial. The trial court erred in concluding that petitioner was entitled to post-conviction relief on that basis.

B. *Trial and Appellate Counsels' Failure to Argue That Statements on a Dispatch Recording Were Not Hearsay*

We turn next to petitioner's claim that both trial and appellate counsel were inadequate because they failed to argue that recorded statements between police and dispatch were not hearsay. Petitioner alleged a claim in section 7 (1)(c) of his petition that trial counsel was inadequate for failing to argue that the evidence "was not hearsay because it impeached the description of the killer given by another witness," and in section 7 (1)(d), he alleged that appellate counsel was inadequate for failing to make the same argument on appeal. The post-conviction court granted relief on both claims. The state assigns error to the post-conviction court's rulings on both claims, arguing that the post-conviction court erred in concluding that petitioner had demonstrated prejudice resulting from trial counsel's deficient performance, and in concluding that appellate counsel performed deficiently. We agree with the state.

At petitioner's criminal trial, a recording of exchanges between police and dispatch was the subject of a dispute concerning admissibility. Defense counsel argued for admission of that recording, which apparently contained statements relaying information from 9-1-1 calls and referring to suspects as Hispanic males. It also contained statements by an officer, Padilla, that a witness had reported seeing a suspect running from the scene, and had described him as a teenaged Hispanic male, 5' 10", with black hair, wearing a turquoise sweater and a black jacket. The trial court did not initially admit the dispatch recording, but ultimately it ruled that the recording was admissible because Defense Exhibit 102, which had already been admitted without objection, was a print-out containing the same information.[12]

---

[12] Petitioner did not introduce as evidence in the post-conviction case the dispatch recording or a transcript of it, and did not provide Defense Exhibit 102 from the criminal trial, which the trial court determined contained the same

As we discuss further below, the state did not call the post-conviction court's attention to the fact that trial counsel had, in fact, argued for admission of the dispatch recording and that the trial court had actually ruled the evidence admissible. It seems that the dispatch recording was not, however, played for the jury. The parties and the post-conviction court apparently all proceeded under the mistaken understanding that the dispatch recording had been excluded by the trial court.

The post-conviction court analyzed the claims as follows:

"During trial, the court excluded evidence of the dispatcher's out-of-court statements relaying information to the police that the shooter was Hispanic. Based on the statements of the eye witness and the circumstances under which the 911 call was made, the statements of the 911 caller regarding the race of the shooter were likely not hearsay, and the defense should have argued that point. Failure to argue that the evidence was not hearsay was ineffective assistance of counsel, both in failing to attempt to change the Judge's ruling and also in failing to protect [petitioner's] rights on appeal.

"Some might argue that, even if admitted, this evidence alone would not be sufficient to show ineffective assistance of counsel, in that it could not affect the outcome of the trial. However, counsel's failure to argue for the admission of useful evidence that supported [petitioner's] theory of the case, shows an ongoing pattern of counsel's failure to exercise reasonable professional skill and judgment. Trial counsel's failure to argue to allow the evidence, when

---

information as the dispatch recording, but in written form. The state has not argued on that basis that the record would therefore preclude petitioner from establishing prejudice. *See Horn v. Hill*, 180 Or App 139, 148-49, 41 P3d 1127 (2002) ("Where evidence omitted from a criminal trial is not produced in a post-conviction proceeding * * * its omission cannot be prejudicial."). We presume, for purposes of analysis of this claim, that the statements at issue are those that were the subject of discussion during trial counsel's arguments for admission of the recording. That discussion indicated that the recording included statements by officers suggesting they had information that the suspects were Hispanic. The discussion also indicated that the recording included statements from dispatch relaying information from 9-1-1 calls. Audio recordings of the 9-1-1 calls themselves, including Thompson's, had already been ruled admissible, and the prosecution played those recordings at trial.

combined with the other poor decisions of counsel, caused [petitioner] to suffer prejudice.

"* * * * *

"The state argues that appellate counsel's choice not to assign error to the ruling discussed above was reasonable, based on the proposition that the appellate courts may affirm the judgment of a trial court notwithstanding evidentiary error, if there is little likelihood that the error affected the verdict. However, as stated above, although some might argue that the failure to argue for the admission of this evidence alone would not be sufficient to affect the verdict in this case, a significant amount of evidence exists that calls to question whether there is sufficient proof to prove that this [petitioner] was the shooter. The failure of appellate counsel to assign error to the ruling was not reasonable given the fact that this piece of evidence would have supported [petitioner's] theory of the case."

The post-conviction court granted relief on both claims.

We first address the claim relating to trial counsel. The state, as noted, points out that trial counsel in fact *did* argue that the statements on the dispatch recording were admissible, and that the trial court agreed, but, as the state acknowledges, it failed to preserve before the post-conviction court any argument that trial counsel did not perform deficiently on that basis. Rather, before the post-conviction court, the state agreed that the trial court had excluded the recording and agreed that the evidence was "probably not hearsay." The state argued only that petitioner had failed to establish that trial counsel's deficiency had caused prejudice, because the jury heard other evidence that the shooter had been described by witnesses at the scene as Hispanic. On appeal, the state asserts that the post-conviction court erred by concluding that trial counsel's failure to ensure that the jury heard the dispatch recording prejudiced petitioner.

At least in the context of a trial, to establish prejudice in an inadequate assistance of counsel claim under Article I, section 11, a petitioner must show that the deficient performance by trial counsel "could have tended to affect the outcome of the case." *Green*, 357 Or at 323, 323 n 13. "That standard requires a determination that there is 'more than mere possibility, but less than probability' that

counsel's inadequacy affected the outcome of the proceeding." *Everett v. Premo*, 279 Or App 470, 479, 380 P3d 1099 (2016) (quoting *Green*, 357 Or at 322). "Whether a criminal defense counsel's failure to investigate, discover, or adduce evidence had a tendency to affect the outcome of a case must be assessed in light of the totality of the circumstances." *Galloway v. Nooth,* 247 Or App 164, 181, 268 P3d 736 (2011). Similarly, a claim under the Sixth Amendment requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694.

Here, the evidence that defense counsel failed to present to the jury—the dispatch recording—was not evidence that, had the jury heard it, could have tended to affect the outcome of petitioner's criminal trial. The jury received the same evidence from other sources. When trial counsel cross-examined Renna, he testified about receiving Padilla's written report containing a named witness's description of a suspect seen running from the scene on the night of the murder. The description was of a Hispanic male, about 5' 10", with a medium build, wearing a turquoise shirt and a black jacket—the same information that was in the dispatch recording. In addition, Defense Exhibit 102, which was admitted at trial, contained the same information as the dispatch recording, but in written rather than audio form. And because the jury heard the recordings of the 9-1-1 calls themselves, they would have heard the same information that dispatch relayed to officers from those calls.

Because the audio of the dispatch recording would have been cumulative of other evidence in the record, petitioner did not establish that he was prejudiced by counsel's purported failure to make an argument supporting the admission of that recording. The post-conviction court erred in concluding that petitioner had established prejudice from that alleged failure.[13]

We next turn to the claim that appellate counsel performed deficiently by failing to assign error to exclusion

---

[13] Moreover, to the extent that the court applied a theory of cumulative error in finding prejudice on that claim, it also erred. The court concluded that petitioner had established prejudice as to trial counsel by showing "an ongoing

of the same evidence in petitioner's direct appeal. In analyzing petitioner's appellate counsel claim, we focus on the deficient-performance element of the claim rather than the prejudice element discussed above. Although the particular legal question it presents results in a similar analysis, it also differs in some respects.

Under the Oregon Constitution, petitioners who seek "post-conviction relief stemming from a claim of inadequate assistance of appellate counsel for failing to assert a claimed error must establish * * * that a competent appellate counsel would have asserted the claim," in order to establish deficient performance. *Guinn v. Cupp*, 304 Or 488, 496, 747 P2d 984 (1987); *see also Field v. Coursey*, 264 Or App 724, 728, 333 P3d 340, *rev den*, 356 Or 400 (2014) (quoting *Guinn*, 304 Or at 496). Similarly, under the Sixth Amendment, appellate counsel need not raise every nonfrivolous claim, but may use professional judgment to choose among them. *Jones v. Barnes*, 463 US 745, 754, 103 S Ct 3308, 77 L Ed 2d 987 (1983). To overcome the presumption of effective assistance of counsel, a petitioner whose appellate attorney filed a merits brief must show that the omitted issue was "clearly stronger than issues that counsel did present." *Smith v. Robbins*, 528 US 259, 288, 120 S Ct 746, 145 L Ed 2d 756 (2000).

---

pattern of counsel's failure to exercise reasonable professional skill and judgment," and thus, trial counsel's failure to present the recording to the jury, "when combined with the other poor decisions of counsel, caused [petitioner] to suffer the prejudice."

No Oregon appellate court has endorsed application of a cumulative-error analysis in post-conviction claims, and the United States Supreme Court has not adopted the approach. *See Ryan v. Palmateer*, 338 Or 278, 290, 108 P3d 1127, *cert den*, 546 US 874 (2005) (rejecting as incompatible with Oregon law the petitioner's contention that "trial counsel's errors, taken together, were so egregious that he should be granted a new trial without" being required to show actual prejudice, "because the entire underlying trial was infected with 'structural error.'"); *id.* at 298-99 (explaining that, although "structural error"—error in which prejudice is presumed—is a viable theory under federal law in some circumstances, the United States Supreme Court has limited its application in the ineffective assistance of counsel context to cases in which the attorney's failure is so complete as to amount to a constructive denial of the right to counsel altogether).

We need not determine, in this case, whether such a "cumulative error" analysis could apply, because we have concluded, as explained both earlier and later in this opinion, that petitioner failed to establish any other deficiencies by trial counsel. Thus, there are no additional deficiencies to cumulate with this one.

The state argued below and reiterates on appeal that petitioner's appellate counsel did not perform deficiently because competent appellate counsel could have concluded that the alleged error was harmless. In its explanation of its ruling on this claim, the post-conviction court applied an analysis similar to its prejudice analysis discussed above.

> "[A]lthough some might argue that the failure to argue for the admission of this evidence alone would not be sufficient to affect the verdict in this case, a significant amount of evidence exists that calls to question whether there is sufficient proof to prove that this [petitioner] was the shooter. The failure of appellate counsel to assign error to the ruling was not reasonable given the fact that this piece of evidence would have supported [petitioner's] theory of the case."

That explanation does not reflect the correct analysis for determining whether appellate counsel performed inadequately.

Any assessment of a lawyer's decision not to raise a claim of evidentiary error on direct appeal from a criminal conviction must take into account whether the lawyer could reasonably conclude that we would affirm the conviction, notwithstanding any such error, because the error was harmless, that is, because "there [was] little likelihood that the error affected the verdict." *State v. Gibson*, 338 Or 560, 576, 113 P3d 423, *cert den*, 546 US 1044 (2005). In determining whether erroneously excluded evidence had little likelihood of affecting the verdict, we assess the excluded evidence "in light of other evidence in the record pertaining to that issue." *State v. Johnson*, 225 Or App 545, 550, 202 P3d 225 (2009). We do not reverse a conviction merely on the basis that excluded evidence would have supported the defendant's theory of the case if the excluded evidence was cumulative of other admitted evidence, and there is, therefore, little likelihood that its exclusion affected the verdict.

Here, even under the assumption that the evidence was excluded, competent appellate counsel could have concluded that the omission would have been harmless because the recording was cumulative of other evidence presented to the jury at trial, as discussed above. The post-conviction court erred in concluding that appellate counsel performed

deficiently by failing to assign error to exclusion of the dispatch recording.

## III. CLAIMS RELATED TO POST-JUDGMENT NEW-TRIAL HEARING

### A. *Trial Counsel's Failure to Move for a Continuance and to Call Thompson as a Witness at the New-Trial Hearing*

Petitioner made multiple claims in his petition alleging that trial counsel's failure to move for a continuance on the morning of the new-trial hearing constituted ineffective assistance of counsel.[14] The post-conviction court granted relief on those claims, concluding that, after receiving Renna's affidavit on the morning of the hearing, trial counsel should have moved for a continuance for the purpose of presenting additional live or affidavit testimony from Thompson to challenge the contents of Renna's affidavit. The state assigns error to the post-conviction court's rulings, arguing that the court erred in concluding that trial counsel had performed deficiently, and in concluding that petitioner had established prejudice. We agree that the court erred in concluding that trial counsel was deficient on those bases. As explained below, the strategy and course of action that trial counsel adopted were reasonable and did not reflect a suspension of professional skill and judgment.

---

[14] The parts of the petition that the post-conviction court referred to as containing those claims are 7 (1)(a) (failure to call Thompson as a witness); 7 (1)(b) (failure to move for continuance of new-trial hearing); 8 (1) (failure to "cross-examine Thompson" at new-trial hearing); and 8 (2) (failure to move for continuance or to call Thompson as a witness at new-trial hearing). The post-conviction court did not grant relief on the claims alleging inadequacy of counsel based on the failure to call Thompson as a witness at the new-trial hearing independently of the claims asserting the failure to seek a continuance. The court consistently linked, in its analysis of the claims on which it granted relief, the failure of trial counsel to call Thompson as a witness to the failure to move for a continuance for that purpose. That is, the court did not grant relief on the basis that trial counsel should have subpoenaed Thompson to the new-trial hearing before she had any reason to know of Renna's affidavit. We refer to all of the above claims collectively as the continuance claim. The post-conviction court granted relief on the continuance claim, as contained in parts 7 (1)(a), 7 (1)(b), and 8 (2) of the petition.

We note that, although the post-conviction court's opinion also found fault with trial counsel's failure to "investigate" the contents of Renna's affidavit, and the failure to file a counteraffidavit, it did so in the context of specifying reasons, in its view, for trial counsel to seek a continuance; petitioner did not allege in his petition corresponding claims based on those failures.

1.  *Defense counsel filed a post-judgment motion for new trial based on newly discovered evidence after locating Thompson.*

At the criminal trial, the jury heard Thompson's 9-1-1 call, but she had given only her first name during the call, and had not been located or identified. Once the defense investigator, De La Melena, identified Thompson as the caller and located her, he interviewed her, and trial counsel obtained an affidavit setting out what her testimony would be. By that time the trial had already ended. Trial counsel filed a motion for new trial pursuant to ORS 136.535 (2001) and ORCP 64, based on the discovery of new evidence.[15] The trial court scheduled a hearing on the motion.

On the morning of that hearing, the prosecutor filed written opposition to the new-trial motion and submitted Renna's affidavit. That affidavit contained information about Renna's own interview with Thompson, and included some information and statements that could potentially be used to impeach her, or to weaken the impact of her testimony.[16] Trial counsel objected to Renna's affidavit on multiple grounds and moved to strike it. The trial court admitted Renna's affidavit over trial counsel's objections, but stated that it would focus primarily on Thompson's affidavit in making its ruling on the new-trial motion:

> "All right. I'm not going to strike it. I will consider it in light of the difficulty in reaching the witness. However, frankly, I think that of far more importance is the affidavit of Miss Thompson herself. And I am focusing on that primarily."

---

[15] ORS 136.535 (2001) has since been amended twice. Or Laws 2003, ch 288, § 1; Or Laws 2009, ch 112, § 1. All references to ORS 136.535 are to the 2001 version. That statute provided that "ORCP 64 A, B and D through G shall apply to and regulate new trials in criminal actions," except as otherwise provided. ORCP 64 (2001) is the version of that rule that applied to petitioner's motion for new trial. The rule has since been amended. *See* Or Laws 2003, ch 194, § 12 (adding declarations as alternative to affidavits); Oregon Council on Court Procedures, Dec 9, 2006 (adding provision concerning effect of notice of appeal to ORCP 64 F). All references to ORCP 64 are to the 2001 version.

[16] For example, Renna stated that Thompson had told him that as the shooter and his companion had run past her, she had seen a "'glimpse of one face, but not anything [she] could pinpoint,'" that she did not know whether that was the face of the shooter or of his companion, and that she would not recognize either of the two men who ran by her that night if she saw them again.

The trial court ultimately concluded that Thompson's testimony would not probably change the result of the trial, and it denied petitioner's motion for new trial for that reason. In explaining its decision, the court focused primarily on the fact that the jury had heard the 9-1-1 recording of Thompson's call in which she described the shooter as a Hispanic man, and that Thompson's testimony as presented in her affidavit (*e.g.*, that she was certain that petitioner was not the shooter) would be undercut or contradicted by several discrepancies between the call—"made moments after the homicide occurred when the events were fresh in her mind"—and her affidavit. Further, the court reasoned, her testimony would not probably change the result in light of petitioner's admissions to Jennifer, Perkins, and Garvin, Muldrew's identification of petitioner as the person he saw shoot Monterroso, and Feliu's identification of petitioner as the person she saw looking for Monterroso shortly before the shooting.

### 2. *Trial counsel's considerations and actions at the time of the new-trial hearing*

As we have emphasized throughout this opinion, a post-conviction court considering an inadequate-representation claim must "evaluate the reasonableness of trial counsel's 'skill and judgment' under the circumstances existing at the time of the challenged act or omission" and must not "'second guess' an attorney's handling of a case 'with the benefit of hindsight.'" *Sullivan v. Popoff*, 274 Or App 222, 231, 360 P3d 625 (2015), *rev den*, 358 Or 833 (2016) (quoting *Pereida-Alba*, 356 Or at 662). We therefore consider the circumstances that existed when trial counsel moved for a new trial based on her investigator's belated identification of Thompson as the 9-1-1 caller.

Trial counsel's written memorandum in support of her motion for new trial, her statements at the new-trial hearing, and her deposition for this post-conviction proceeding reveal some of the considerations she had in mind at the new-trial hearing. Trial counsel stated at her deposition that she did not subpoena Thompson to the new-trial hearing because she was following the procedure described in ORCP 64. That rule provided that, when a motion for new

trial is based on newly discovered evidence, "it shall be upon affidavit setting forth the facts upon which the motion is based," and that "the affidavits or declarations of any witness or witnesses showing what their testimony will be, shall be produced." She filed the motion within the time allowed and with Thompson's affidavit. As she put it at her deposition, she "got bombarded" the morning of the hearing with Renna's affidavit and the prosecutor's response to the motion. She objected to the affidavit as untimely and moved to strike it, and she objected that it was not "an affidavit of the affiant." The trial court seemed to understand the latter objection as akin to a hearsay objection, telling the prosecutor, "Talk to me about your view on the argument that [trial counsel] makes that this is an out of court statement made by the witness, * * * Thompson, rather than a statement made by her in affidavit form." The prosecutor argued that Renna's account of Thompson's statements to him would be admissible as impeachment evidence. The trial court overruled trial counsel's objection and denied her motion to strike.

At her 2010 deposition, trial counsel questioned whether she should have requested time to attempt to call Thompson to the hearing to challenge Renna's statements: "[I]n retrospect, you know, should I have said 'Hey, wait a minute, I want her here because I haven't had an opportunity to * * * challenge the statements of Detective Renna.'" But counsel's concerns at the time were ensuring that she was complying with ORCP 64, ensuring that the new-trial issues were preserved, and taking the opportunity to argue the motion to the court at a hearing. Trial counsel noted that the trial court "doesn't even have to have a hearing" on a motion for new trial. She also knew that there are strict time constraints, and that delay can be fatal to the motion: "They can just take the—the motion and as the time lapses, you know, then the motion is deemed denied[.]"

The laws governing motions for new trial, and the legal requirements for granting a new trial, provide additional context for trial counsel's decisions. Trial counsel cited ORS 136.535 and ORCP 64 in her motion, and had set out ORS 136.535 in full in her memorandum supporting the motion. ORS 136.535 provided:

"(1)  A motion in arrest of a judgment or a motion for a new trial, with the affidavits, if any, in support thereof shall be filed within five days after the filing of the judgment sought to be set aside, or such further time as the court may allow.

"(2)  Any counteraffidavits shall be filed by the state within five days after the filing of the motion, or such further time as the court may allow.

"(3)  The motion shall be heard and determined by the court within 20 days after the time of the entry of the judgment, and if not heard and determined within that time, the motion shall conclusively be considered denied.

"(4)  Except as otherwise provided in this section, ORS 19.430 and ORCP 64 A, B and D through G shall apply to and regulate new trials in criminal actions, except that a new trial shall not be granted on application of the state."

Trial counsel also referred to the time limit in ORS 136.535(3) at the hearing on the motion for new trial.

"[Trial Counsel]:   I want to thank the Court for having the oral argument.

"THE COURT:   Sure. It's important.

"[Trial counsel]:   It's not always granted though, so I appreciate that.

"THE COURT:   I'm surprised.

"[Trial counsel]:   Sometimes 20 days goes by and you don't hear from the court.

"THE COURT:   I thought it was important."[17]

3.  *Post-conviction court's ruling*

The post-conviction court began its written analysis of the continuance claim by stating, "To evaluate the

---

[17] The date of the hearing on the motion for new trial appears to have been more than 20 calendar days after entry of the judgment. The statute that governs how the 20-day time period in ORS 136.535(3) is calculated, however, provides for several ways in which a day might be excluded from the end of the calculation, resulting in a longer time period. *See* ORS 174.120 (2003), *amended by* Or Laws 2003, ch 228, § 1; Or Laws 2013, ch 1, § 14 (setting out method for calculating day by which specified act must be done). The trial court and trial counsel appear to have considered the hearing to be within the time limitation, of which they were aware.

ineffective assistance of trial counsel claim[s,] *** counsel's performance must first be viewed in light of the Court of Appeals decision on [petitioner's] Motion for New Trial." The post-conviction court set out the legal requirements for obtaining a new trial based on newly discovered evidence, and reviewed our decision in petitioner's direct appeal, *Farmer*. It emphasized a statement in the opinion that "**'Defendant offered no evidence to dispute Renna's account of that interview,** in which Thompson acknowleged that she had seen only a glimpse of one face and would not be able to recognize the person whom she had seen.'" (Quoting *Farmer*, 210 Or App at 644 (boldface added by post-conviction court)). The post-conviction court explained its view:

> "And with that final paragraph, the Court of Appeals found that the trial court had not abused its discretion in denying the Motion for New Trial. The appellate court found that since [petitioner] offered no evidence to dispute Renna's account of the interview, it was not an abuse of discretion to deny the Motion for New Trial. However, reading between the lines, it seemed to be a close call."

The court further opined that trial counsel should have investigated the statements in Renna's affidavit in a number of ways, including whether the affidavit accurately reflected Thompson's statements to Renna, and whether Thompson "had said what she meant to say."

> "This affidavit changed the Motion for New Trial from a motion the defense should have won, to a motion the defense lost. Defense counsel had a duty to investigate whether or not the affidavit was accurate.
>
> "Trial counsel did move to strike the affidavit, and the Court denied the request. But, there were other options available that trial counsel should have attempted.[5] At least trial counsel could have asked for a continuance for long enough to analyze her options. The detective called Thompson and she called him back. There is no evidence that counsel even asked for a 30 minute recess to try to call Thompson. If counsel had spoken with Thompson, counsel could have filed a counter affidavit. Given the opportunity to speak through a counter affidavit, Thompson would have provided testimony to rebut Renna's affidavit, which

would have potentially changed the opinion of the Court of Appeals.

"As stated in *State v. Ben*, 310 Or 309[, 317, 798 P2d 650 (1990),] there were other options. 'On the other hand, a remedy short of preclusion, such as a recess or postponement, conceivably could have avoided any prejudice caused by the late disclosure by allowing the state time to talk to the witnesses.' Trial counsel should have made use of the other options available. Failure to ask for a recess or postponement allowed the prejudice of the late disclosure to turn [petitioner's] Motion for New Trial from a winning motion to a losing motion. Trial counsel failed to exercise reasonable professional skill and judgment, resulting in prejudice to [petitioner].

"And if trial counsel had been thoroughly advocating for her client, she should have petitioned the Court to hear the testimony of the eyewitness. The State's brief says it well, 'If the trial court had granted a continuance of the hearing, both parties would have had the opportunity to **prepare and present two witnesses**, \*\*\* Thompson and \*\*\* Renna.' \*\*\* Exactly!

---

"⁵ One of the reasons the [trial court] cited in the [its] decision not to strike the affidavit was the difficulty in reaching the witness, Thompson. However, at the Motion for New Trial, the prosecutor stated that Detective Renna first tried to contact Thompson on Monday, April 15, 2002. Later that week Thompson called him back, but the Detective was not able to interview her until Friday, April 19, 2002. Thompson was then interviewed on Friday as arranged. The Detective first tried to make contact with the witness on a Monday, and had interviewed the witness by Friday. Although originally difficult to find due to the glitches in the 911 system, Thompson was easy to find at the time of the Motion for New Trial."

(Boldface and underlining in original.) The post-conviction court went on to find, based on Thompson's testimony before that court during the post-conviction trial, that "Thompson could convincingly testify to a trier of fact that the shooter was not [petitioner]," and "she comes across as credible." The court also found that Thompson's reluctance to testify was related to her "fear for her family, including her small child, given the potential gang nature of the shooting."

The court concluded that trial counsel's deficiency prejudiced petitioner because, had trial counsel called Thompson as a witness, or filed a counteraffidavit, the trial court "may well have" decided the new-trial motion differently, and, even if it did not, the Court of Appeals "would not have based" the decision in *Farmer* "on the fact that, 'Defendant offered no evidence to dispute Renna's account of that interview.'" (Quoting *Farmer*, 210 Or App at 644 (boldface by post-conviction court omitted).) Ultimately, the post-conviction court concluded that trial counsel failed to exercise reasonable professional skill and judgment by failing to request a continuance, and by failing to call Thompson as a witness, and that petitioner had been prejudiced as a result of those deficiencies.

### 4. *Analysis under correct legal standards*

The state argues that the post-conviction court erred because it did not apply the correct legal standards for determining whether counsel performed deficiently and for determining whether any deficiency caused prejudice. As part of that argument, the state asserts that, underlying the post-conviction court's analysis is an incorrect assumption, in light of our later decision in petitioner's direct appeal, that trial counsel should have recognized that Renna's affidavit would be critical to the ultimate outcome of the motion for new trial.

We agree with the state that the post-conviction court erred in its legal analysis of the deficient performance element, and because we reverse on that basis we need not reach the state's prejudice argument. The post-conviction court failed to confine its analysis to whether trial counsel exercised reasonable professional skill and judgment under the circumstances from her perspective at the time of the new-trial hearing, and without the "'distorting effects of hindsight.'" *Montez*, 355 Or at 7 (quoting *Lichau*, 333 Or at 359). Instead, the post-conviction court incorrectly focused on our later decision in *Farmer*, and in particular the single statement in that opinion that petitioner had "offered no evidence to dispute Renna's account of [his] interview" with Thompson, 210 Or App at 644, providing a crucial backdrop for its analysis of trial counsel's actions. The post-conviction

court accordingly viewed trial counsel's failure to take additional steps to oppose or challenge Renna's affidavit as reflecting a deficiency, or a complete lack, of professional skill and judgment. It correspondingly discounted the soundness of the choices that trial counsel did make, which in hindsight were unsuccessful.

But rather than measuring trial counsel's choices by the ultimate outcome in our decision in *Farmer*, a correct analysis of whether trial counsel performed deficiently must begin—and end—by viewing trial counsel's performance only in light of the information, circumstances, and options that she had before her at the time of the new-trial hearing. When analyzed in that correct context, trial counsel's strategic and tactical choices reflect an exercise of reasonable professional skill and judgment.

Petitioner had the burden of demonstrating that no reasonable counsel could have chosen to forgo asking for a continuance under the circumstances and from trial counsel's perspective at the time of the hearing. *Pereida-Alba*, 356 Or at 663-64. After receiving Renna's affidavit on the morning of the hearing, trial counsel objected to it as untimely, objected to statements attributed to Thompson being included in it, and moved to strike it. The trial court overruled those objections and denied the motion to strike, but stated that it would focus primarily on Thompson's affidavit rather than Renna's.

Under those circumstances, there could be both advantages and disadvantages to seeking a continuance. Advantages might include presenting Thompson's testimony in person, potentially challenging or rebutting Renna's affidavit, to blunt its effect on Thompson's affidavit. However, there were also sound strategic reasons to move ahead rather than delay. Reasonable counsel could choose to rely on the trial court's assurance that it would focus on Thompson's affidavit rather than on Renna's. In addition, relying on the affidavit would avoid causing inconvenience or anxiety for Thompson, who was a reluctant, fearful witness. Further, relying on the affidavit—which already contained statements that were inconsistent with Thompson's 9-1-1 call—had the advantage of presenting known, fixed testimony

from Thompson. By contrast, calling her as a live witness at the new-trial hearing would give the prosecution an opportunity before any retrial to cross-examine Thompson on the record, possibly risking creation of additional inconsistencies that could be exploited in cross-examination at a new trial if the motion were granted. The prosecution also would have had an opportunity to bring Renna, an experienced detective who had testified in court many times, as its own live witness.[18] Thus, moving forward in light of the trial court's stated intention to focus on Thompson's affidavit rather than Renna's avoided the possibility, if both sides presented live witnesses, that Renna's in-person testimony would capture more of the trial court's attention than it intended to devote to his affidavit. Finally, forgoing a continuance would take into account the time constraints in ORS 136.535, and would recognize that delay could be fatal to the motion. In light of those considerations, trial counsel could reasonably decide not to seek a continuance in order to obtain Thompson's live testimony.

We observe, however, although petitioner does not emphasize it, that the post-conviction court found that trial counsel "failed to take time to reasonably evaluate the options" available at the new-trial hearing. To the extent that the statement may be construed as a finding that trial counsel did not consciously consider the option of moving for a continuance, but simply overlooked that possibility, the finding nonetheless does not present a basis for affirmance. In *Pereida-Alba*, the Supreme Court set out the analysis that must be conducted when a claim rests upon an allegation that counsel unreasonably failed to consider an option, and the petitioner contends that that failure amounted to constitutionally deficient performance. Resolving such a claim depends upon,

"among other things, whether the strategy that defense counsel did employ was reasonable, the relationship between the evidence or theory that defense counsel failed to consider and the strategy that counsel did pursue, and

---

[18] Renna testified at the post-conviction trial that he would have been available to testify at the hearing, he was "right across the street" from the courthouse, and that he would have testified consistently with his affidavit.

the extent to which counsel should have been aware of the strategy that petitioner now identifies."

*Pereida-Alba,* 356 Or at 674.

Here, the strategy that trial counsel did pursue was, as discussed, reasonable. Counsel should also have been aware, however, of the strategy of seeking a continuance when she was presented with an affidavit on the morning of the new-trial hearing.

As set out above, there would have been both advantages and disadvantages to seeking a continuance from trial counsel's perspective at the time. We also consider the relationship between the strategy petitioner asserts counsel should have pursued and the one she actually did pursue. Significantly, the two strategies were mutually exclusive. If counsel sought, and was granted, a continuance in order to call Thompson as a witness, she could not simultaneously press forward with the hearing. Consequently, seeking a continuance would mean giving up the many advantages associated with the latter strategy, which we have previously discussed, such as avoiding Renna testifying as a live witness, and taking advantage of the court's stated intention to focus on Thompson's affidavit. Although the strategy that trial counsel did pursue did have some disadvantages in addition to its advantages, it would not have been unreasonable to select that strategy over seeking a continuance. In those circumstances, failure to consider what reasonably could have been viewed as a risky course of action—delaying resolution of the new-trial motion to present testimony of a fearful, reluctant witness and giving the prosecution an additional opportunity for cross-examination of that witness—does not represent a suspension of professional skill and judgment.

To be sure, in her deposition trial counsel expressed doubts about whether she perhaps should have taken any of several actions that, "in retrospect" might have been more successful. She wondered whether she should have "anticipated that [Thompson's] affidavit" would be challenged on the day of the hearing, and should have, "in retrospect, * * * said 'Hey, wait a minute, I want [Thompson] here because I haven't had an opportunity to * * * challenge the statements

of Detective Renna.'" She considered whether, in light of the Court of Appeals opinion in *Farmer*, she should have "called her at the motion for new trial" hearing, or otherwise should have done more to challenge Renna's affidavit. Although trial counsel's concerns about her tactical choices, viewed in hindsight, are understandable, a court evaluating a post-conviction claim is to evaluate the lawyer's conduct using the legal analysis we have applied here. That analysis may sometimes be informed by the lawyer's recollections and opinions, but it is not determined by the lawyer's retrospective regret about strategic and tactical choices. *See Burdge v. Palmateer*, 338 Or 490, 492, 112 P3d 320 (2005) (court evaluating a post-conviction claim must view the circumstances from the lawyer's perspective at the time, without the benefit of hindsight, and is not to second guess tactical decisions unless they reflect an absence of professional skill and judgment). As the Supreme Court observed, "[t]he constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that [the lawyer] would have preferred to have avoided." *Krummacher v. Gierloff*, 290 Or 867, 875, 627 P2d 458 (1981).

Trial counsel did not render inadequate assistance of counsel as alleged in the continuance claim. The post-conviction court erred in granting relief on that basis.

B.  *Failure to Raise Constitutional Challenges to New-Trial Evidence and Procedures*

Citing *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, section 11, of the Oregon Constitution, petitioner asserted claims that trial counsel was inadequate for failing to object to the procedures that apply to new-trial hearings, and to object to the contents of Renna's affidavit. The gravamen of both claims was that trial counsel should have taken additional steps to prevent Renna's affidavit from being admitted, or the contents of it from being considered, at the new-trial hearing. The post-conviction court granted relief on those claims. In concluding that trial counsel performed deficiently, the court again failed to confine

its analysis to whether trial counsel exercised reasonable professional skill and judgment under the circumstances from her perspective at the time of the new-trial hearing, without the "distorting effects of hindsight," and failed to give appropriate consideration to sound strategic and tactical considerations for not raising the objections petitioner asserts. *See Cullen v. Pinholster*, 563 US 170, 196, 131 S Ct 1388, 179 L Ed 2d 557 (2011) (courts analyzing claims of ineffective assistance of counsel are "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [a petitioner's] counsel may have proceeded as they did" (internal quotation marks, brackets, and citations omitted); *see also Hayward v. Belleque*, 248 Or App 141, 155-56, 273 P3d 926 (2012), *rev den*, 353 Or 208, *cert den sub nom Hayward v. Premo*, ___ US ___, 134 S Ct 101 (2013) (analyzing counsel's performance using similar approach).

For the same and similar strategic reasons as those we identified as applicable to the continuance claim, reasonable trial counsel could have pursued the course of action that petitioner's counsel did rather than raise the objections petitioner asserts. After receiving Renna's affidavit, trial counsel objected to it as untimely, made an objection to statements by Thompson being included in it, and moved to strike it. The trial court overruled trial counsel's objections, stating, as we have discussed, that it would focus primarily on Thompson's affidavit and not on Renna's.

Although the post-conviction court acknowledged that trial counsel did object to the statements in Renna's affidavit, it concluded that she should have objected to and moved to strike each statement, line by line. But, under the circumstances, reasonable trial counsel could have chosen not to require the trial court to focus its attention on Renna's affidavit by asking it to rule on line-by-line objections. In addition, trial counsel could have considered that a successful objection to Renna's affidavit or its contents would not likely result in the evidence ultimately being excluded. Rather, it would likely result in Renna being called as a live witness. Because trial counsel had sound tactical reasons not to further object to admission of Renna's affidavit or its

contents, petitioner failed, as a matter of law, to establish that trial counsel provided inadequate or ineffective assistance of counsel on these claims.

In addition, as noted above, a successful objection to Renna's affidavit or its contents would not have resulted in the exclusion of the evidence altogether. Rather, the evidence at the post-conviction trial was that Renna was readily available and close by. The likely result of a successful objection to the use of his affidavit, or to its contents, would have been that Renna would have been called as a live witness. Accordingly, even if trial counsel's failure to make the specified objections could have led to the exclusion of Renna's affidavit or certain statements in it, petitioner failed to establish that such a failure caused prejudice.

The post-conviction court erred in granting relief on the basis that trial counsel should have objected to the contents of Renna's affidavit, and to the new-trial procedures permitting submission of affidavits.

## IV.  CONCLUSION

In sum, the post-conviction court erred in concluding that petitioner was entitled to post-conviction relief on any of the claims on which it granted relief. Accordingly, we reverse the portion of the judgment granting relief and remanding for a new trial.

Portion of judgment granting post-conviction relief and remanding for new trial reversed; otherwise affirmed.

**ORTEGA, J.,** dissenting.

I agree with most of the majority's decision in this post-conviction case. However, I disagree with the majority's conclusion that the post-conviction court erred when it concluded that petitioner received inadequate assistance of counsel because his trial counsel "failed to call * * * Franklin Wong * * * as an expert witness to testify that a handgun * * * found in the possession of * * * Baines, was more likely than not the firearm that discharged the bullet found in the deceased." The post-conviction court granted relief after concluding that "a reasonable attorney would have called Wong

to testify as a defense expert." Because I would affirm that portion of the post-conviction court's judgment, I dissent.

Petitioner, then a teenager, was convicted of killing the victim by shooting him in the chest. No physical evidence tied defendant to the murder. At trial, the evidence against him included testimony from a witness who identified defendant as someone who had been looking for the victim before the shooting, testimony from a witness who identified him as the person who shot the victim, and testimony from defendant's ex-girlfriend and her parents who testified that defendant confessed to the killing, although they did not initially believe the confession. Petitioner's defense in his criminal trial was that he was not the killer; in addition to undermining the certainty of the identification testimony and questioning the motives of his ex-girlfriend and her parents, petitioner introduced evidence that the police had information that Baines, who closely resembled defendant, was seen near the crime scene and was reputed in the neighborhood to have been involved in the killing. Other than interviewing Baines, the police did little to investigate him for the murder and did not include pictures of him in any photo throw-downs, but during trial, a police investigator mistakenly identified a photo of Baines as a photo of defendant.

Thus, in order to create reasonable doubt that he was the shooter, petitioner set out not only to undermine the eyewitness identifications of him (as the shooter and as someone looking for the victim) and the testimony about his confession, but also to bolster the possibility that Baines was the shooter, despite the fact that police had not extensively investigated Baines for the murder.

As it happened, the police had recovered a Rohm revolver associated with Baines and had compared test-fired bullets from that revolver with the bullet fragments recovered from the victim. Petitioner's trial counsel had access to an expert witness, Wong, who would have testified affirmatively regarding the likelihood that the Rohm was the murder weapon, but counsel chose not to call that witness in favor of much more equivocal testimony elicited on cross-examination from a state witness, Gover. Although counsel offered a reason

for that choice, her decision did not meet the constitutional standard for adequate assistance of counsel, because it was not based on a reasonable evaluation of the likely costs and potential benefits of presenting affirmative testimony in support of that important aspect of the defense theory.

The majority correctly notes that tactical decisions of defense counsel are entitled to deference if they are based on an appropriate evaluation. 283 Or App at 745-46 (citing *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001), and *Lichau v. Baldwin*, 333 Or 350, 360, 39 P3d 851 (2002)). It concludes that trial counsel's evaluation was appropriate in this case because she consciously weighed the likely costs and potential benefits of her chosen trial tactic and concluded that, although Wong would provide a more favorable bullet-comparison opinion on direct examination, he was vulnerable on cross-examination and could undermine the credibility of the defense case. 283 Or App at 747-48.

However, the majority defers too much to counsel's weighing of the costs and benefits. As the Supreme Court has explained:

"A 'tactical decision in the course of an investigation is *a conscious choice by a lawyer either to take or to omit some action on the basis of an evaluation of the nature and complexity of the case, the likely costs and potential benefits of the contemplated action, and other factors.* But the fact that a lawyer has made a 'tactical decision' does not mean that the lawyer's choice meets the constitutional standard for adequate assistance of counsel."

*Stevens v. State of Oregon*, 322 Or 101, 109, 902 P2d 1137 (1995) (emphasis added). Consequently, some tactical decisions, such as counsel's decision not to interview certain potential witnesses in *Stevens*, will turn out not to be "a reasonable evaluation of the likely costs and potential benefits of pursuing the investigation." *Id.* Likewise, in *Lichau*, 333 Or at 361-63, the court concluded that counsel's decision not to pursue certain avenues of investigation and to withdraw an alibi defense, though made consciously, did not constitute reasonable exercises of professional skill and judgment.[1]

---

[1] I cite *Stevens* and *Lichau* only to indicate the fundamental standard under which we must review any tactical decision made by defense counsel. In this case,

Here, petitioner's trial counsel considered and rejected the idea of presenting Wong as a witness, but that tactical decision was not a reasonable exercise of professional skill and judgment. Even assuming that Gover's credentials were better than Wong's, the concession that petitioner's counsel was able to elicit from Gover was not an adequate substitute for Wong's affirmative testimony. Although Gover allowed on cross-examination that he could not exclude the Rohm as the murder weapon, he did so only after lengthy direct testimony about the 30 or 40 different types of firearms that could have fired the bullet, conveying the distinct impression that he did *not* believe that the Rohm was the murder weapon. The jury would have had to go out onto a limb to conclude, with only Gover's sliver of conceded doubt to guide them, that the possibility that the Rohm was the murder weapon, which Gover could not eliminate, created reasonable doubt as to defendant's guilt.

Wong's testimony, by contrast, would have offered the jury an affirmative basis—otherwise lacking—for concluding that Baines was the shooter, not petitioner. Although Wong had no formal training in bullet comparison, he had "extensive experience in the comparison study of bullets" and had worked on "over a dozen cases involving firearms." Indeed, the court in petitioner's criminal trial concluded that Wong was qualified to testify on the subject. The misgivings of trial counsel about how Wong would fare under cross-examination had only to do with the difference in his credentials compared with Gover's, and do not establish an adequate reason for depriving the jury of the opportunity to hear and weigh testimony that offered an otherwise-missing affirmative expert opinion supporting the defense theory:

"Well, I really thought that if I called Wong that [the prosecutor] would be effective in cross-examination and in

I recognize that counsel's decision to investigate potential expert witnesses was a tactical decision subject to review; however, so too was the choice not to use the fruits of her investigation. That latter decision is what is truly at issue in this case—a decision that is also subject to review for its adequacy. *See Martinez v. Baldwin*, 157 Or App 280, 972 P2d 367 (1998), *rev den*, 329 Or 10 (1999) (engaging in a searching inquiry of counsel's decision not to call the defendant's mother as a witness); *Pinnell v. Palmateer*, 200 Or App 303, 319-20, 114 P3d 515 (2005), *rev den*, 340 Or 483 (2006) (engaging in a similar examination of counsel's decision not to call a witness).

challenging his lack of ballistics training and tool mark identification. * * * So I just thought that the jury would perceive my expert as, you know, less credible, and * * * I thought it would detract from * * * the strength of our case."

As understandable as those doubts may have been, they did not provide an adequate justification for depriving the jury of the opportunity to hear an expert who actually believed that the Rohm likely was the murder weapon. Indeed, such testimony, even if challenged, likely would have enhanced the value of Gover's acknowledgement that he likewise could not exclude the Rohm as the murder weapon.[2]

Although the majority justly cautions against evaluating, with the unfair benefit of hindsight, whether trial counsel's tactic was successful or effective, 283 Or App at 747, we must also be wary of according deference to counsel's decisions simply because they appear to be understandable and might even be decisions that one of us might have made in her shoes. We are not called upon to decide whether counsel's assessment was understandable; rather, we are called upon to assess whether it was based on "a reasonable evaluation of the likely costs and potential benefits" at issue. *Stevens*, 322 Or at 109. As we have previously indicated, the "question in each case is whether trial counsel's investigation was *legally and factually appropriate to the case.*" *Thompson v. Belleque*, 268 Or App 1, 17, 341 P3d 911 (2014), *rev den*, 357 Or 300 (2015) (emphasis added). That is, in assessing whether counsel engaged in a reasonable evaluation, we must not consider any explanation in the abstract; rather, we must consider it within the overall context of the case. Here, given that there was no physical evidence connecting defendant to the crime and that part of defendant's trial strategy was to connect Baines to the crime, it was not reasonable to deprive the jury of the opportunity to weigh affirmative expert testimony that the Rohm likely was the

---

[2] There is a separate issue of whether Wong's testimony would have been helpful in establishing that the Rohm was operable at the time of the shooting. The state's evidence does tend to suggest that the Rohm was inoperable, whereas it is unclear what Wong's testimony would have been regarding operability. However, given that Gover still did not rule out the Rohm even in the face of the state's evidence regarding operability, any problems with Wong's testimony do not make it reasonable to deprive the jury of an opportunity to weigh the value of that testimony.

gun used in the shooting, especially when the only apparent factor weighed by counsel in reaching her decision was that the expert at issue had less impressive credentials than the state's expert. There is no indication that counsel considered the effect of failing to present a defense expert altogether. With Wong's affirmative testimony, Gover's concession likely would have become more, not less, useful in providing the jury with a basis for finding reasonable doubt that petitioner was the shooter. Without it, Gover's concession, standing alone, was not a reasonable substitute; it required the jury to invent its own opinion without the validation of an expert.

Indeed, the United States Supreme Court has recognized the importance of retaining defense experts to address the testimony offered by prosecution experts, given that prosecution experts can and do make mistakes regarding forensic science. *Hinton v. Alabama*, 571 US ___, 134 S Ct 1081, 1090, 188 L Ed 2d 1 (2014). The Court has noted that there is a threat posed to the fairness of criminal trials by faulty forensic science and that such threat is "minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses." *Id.* Here, although we acknowledge that there is little indication that Gover's testimony was faulty, it was woefully inconclusive, at least with regard to the point that defendant set out to prove—that the Rohm *was* the murder weapon. Without the testimony of a defense expert, I cannot conceive how defendant received a fair opportunity to establish that Baines was the shooter.

For those reasons, I would conclude that the post-conviction court applied the correct legal standard and that there was a sufficient basis for it to conclude that no reasonable attorney would have chosen to exclude Wong's testimony. Because I would affirm that portion of the trial court's decision, I dissent.

Egan, and Flynn, JJ., join in this dissent.