WALTERS, C.J.
*172 **681 Petitioner was convicted of murder with a firearm. He sought post-conviction relief, arguing that his defense counsel was constitutionally inadequate for, among other things, deciding not to call a defense expert who would have testified that a gun seized from another suspect's residence was "likely" the murder weapon. The post-conviction court agreed with petitioner and ordered a new trial. We reverse the contrary decision of the Court of Appeals and affirm the post-conviction court's judgment.
I. HISTORY AND GENERAL BACKGROUND
Monterroso was shot and killed one January evening in 2001 while he was walking down the street with his two friends, Muldrew and McCauley.[1] Two men had approached the group from behind, and one of them demanded, "Give us your money." Monterroso was then grabbed, turned around, and shot in the chest. The two men then ran off. Muldrew hurried to a payphone at a nearby store to call 9-1-1. A second person, Thompson, also witnessed the shooting and reported it to 9-1-1.[2] Police soon arrived and, about two weeks later, arrested petitioner for the murder.
**682 The primary evidence against petitioner was in the form of witness testimony: He was placed in the area before the murder and looking for Monterroso; he was identified as the shooter; and he made several admissions that he had killed Monterroso. Petitioner contested the credibility and reliability of those witnesses and proffered evidence that his admissions differed from the forensic evidence. He focused his defense, however, on evidence that Baines, a man who resembled petitioner, had committed the murder. He adduced evidence that the police had information that "word on the street" was that Baines was involved in the murder and had been seen on the night of the murder riding a bicycle away from the crime scene. He also adduced evidence that Baines had access to a gun that could have been the weapon used in *173 the shooting. That gun, a Rohm .38 special (the Rohm), was recovered during the execution of a search warrant in an unrelated matter at a house at which Baines resided.[3] The Rohm, along with the bullets discovered with it, was test-fired by a forensic firearms examiner with the Oregon State Police-Grover.[4] Grover prepared a report about his findings, as did the defense's expert, Wong. Grover opined that it could not be determined whether the Rohm had fired the fatal bullet; Wong, however, concluded that the Rohm was "likely" the murder weapon. At a pretrial hearing, defense counsel explained the Rohm's importance to petitioner's case and her intent to call Wong to testify:
"[The Rohm], in our position, is exculpatory evidence in this case that [petitioner] is not the perpetrator of this homicide. We expect to put on ballistics evidence of that firearm. We expect to talk about the likelihood that that firearm was the firearm used in the homicide."
At trial, the state called Grover, who testified that he had been with the Oregon State Police for a little more than three years, beginning as an analyst who entered data from firearms into a database.[5] Grover had served in **683 that capacity for about a year and a half before becoming a forensic firearms examiner. In that role, he had completed a year-long curriculum at the Bureau of Alcohol and Firearms Examiners Academy, the details of which he recounted to the jury. Explaining his process in this case, Grover testified that he had used the characteristics and measurements of the bullet that killed Monterroso and entered them into a database, which produced a nine-page report of firearms that could have fired the fatal bullet. That list included both a Rohm .38 special, the kind of gun recovered at Baines' residence, and a .357 revolver, the kind of gun the state contended that petitioner had used to kill Monterroso.[6]
Grover then thoroughly discussed forensic bullet examination analysis, which he summed up as follows:
"[I]n order for a bullet to be considered a positive identification or a match, the amount of agreement that we see between the test-fired bullet and the bullet in question has to exceed the amount of agreement known to have been observed between two bullets test-fired from different firearms, and at least be consistent with the amount of agreement that we had seen between two bullets that we know were fired from the same firearm."
Grover testified that the bullets from the Rohm shared all discernible class characteristics with the fatal bullet-like caliber and twist direction of the lands and grooves-and agreement on some individual characteristics-like striations. Grover testified that those results, however, were insufficient to say with certainty that the fatal bullet had been fired from the Rohm. Grover testified that there are 30 to 40 different types of firearms that could have produced similar results and, when asked how many of those kinds of firearms are in the Portland area, stated,
"Probably talking millions of guns out there. It's hard to say. With this particular small subset there's probably thousands, hundreds of thousands, of these particular types of guns."
**684 Ultimately, when asked what he could say with scientific certainty about the issue, Grover stated that "it could not be determined whether or not [the fatal bullet] was fired from" the Rohm. Grover explained that his results were peer reviewed by an equally *174 trained analyst, who came to the same conclusion. To close out his testimony, Grover opined that evidence that someone had used a .357 revolver to kill Monterroso would be consistent with his findings. Grover said that he would expect a bullet fired from a .357 revolver to have agreement with the fatal bullet on all class characteristics and that it was possible that it also would have "some agreement of individual characteristics."
After the state wrapped up its case-in-chief, the defense presented its case. Defense counsel called officer Santos. Santos testified that he had requested and served a search warrant at a residence where Baines resided. Santos explained that the warrant was not related to Monterroso's murder and instead related to a report that Baines, a felon, had been seen with a semi-automatic firearm at the residence. Santos testified that Baines was on a first-floor couch when the warrant was served and that the Rohm was in a black case in an upstairs bedroom belonging to Waller, the owner of the Rohm. On cross-examination, the prosecutor asked about the Rohm's operability. Santos testified that, based on his experience with firearms, it looked as if the Rohm had not been fired "in quite a long time." Santos further testified that Baines had not been charged with being a felon in possession of a firearm and indicated that part of the reason was that the Rohm was not functional when the police seized it. Santos explained that, to prove "the crime of felon in possession of a firearm, you do have to prove that the gun is functional." On re-direct, Santos conceded that he could not say with certainty the last time the Rohm was fired.
The defense then called Grover back to the stand. The purpose of this testimony seemed to be to pave the way for Wong-who was a civil engineer with no specific training in forensic bullet examination-to testify. Defense counsel asked Grover whether he had a background in mechanical engineering or metallurgy, to which he responded that **685 he did not. Defense counsel then asked if he could "quantify the regular degree of agreement" he observed between the fatal bullet and the bullets test-fired from the Rohm. Grover explained that forensic firearms examiners "don't use a quantitative or percentage type criteria for doing our comparison work." That is, for example, firearms examiners do not say that there is a 90 percent or a 50 percent match between bullets-essentially, it is either a match, not a match, or inconclusive. Grover explained that "the amount of agreement we observe is based on the examiner's training and knowledge by examining and comparing actual bullets they know have been test fired from different firearms." When defense counsel asked if bullet comparison is then entirely subjective, Grover stated, "subjective in nature based on the individual examiner's training, knowledge, and experience, yes." Grover explained that the "baseline" that he uses to measure the agreement between bullets could be different from another examiner's; however, he expected that another examiner with a similar background would reach the same conclusion that he did and, perhaps, that someone with more experience could "see something that [he] might not have."
After Grover testified, the court held a hearing outside the presence of the jury to determine whether Wong was qualified as an expert in forensic bullet examination. Wong, a professional engineer licensed in both California and Oregon, had been working as a forensic mechanical engineer for nine years. He was the vice president of a forensic engineering firm that worked on all types of engineering projects, including auto accident reconstructions, fire investigations, and criminal cases. Wong had testified as an expert in other matters, and he explained how his background in mechanical engineering and metallurgy was relevant to forensic bullet analysis and firearms. Wong said that firearms are mechanical devices that "incorporate any number of mechanical engineering principles, from materials, material selection, heat treating, linkages, pressure, [and] design." He discussed the courses he had taken and explained how they would apply to the manufacture of firearms. Wong explained that his education and experience enabled him to talk about the microscopic changes that **686 could occur to a firearm over time as a result of "broaching," a cutting procedure that Grover had discussed during his testimony. Wong testified that he had extensive *175 experience in the comparison study of bullets, explaining that he worked on over a dozen cases involving firearms, three or four of which involved the comparison of bullets. Wong further stated that had training and experience in using microscopic equipment to make comparison studies of metals; he explained that it is "a visual observation, and what you look for is both similarities and differences between a part that you are trying to find more information on and parts that you have information about already."
On cross-examination, the state elicited testimony from Wong that he had received no formal training through workshops or seminars regarding bullet comparisons. The trial court then interrupted the prosecutor and informed him that "the likelihood that [the court was] going to prevent [Wong] from testifying is not high" because of "his background and working with metals." The court explained that the jury could weigh Wong's answers to the prosecutor's questions. The prosecutor indicated that he understood and ended his questioning.
At that point, the defense told the court that it would wait until the morning to call Wong to the stand and instead called two witnesses whose testimony was expected to be short. After those witnesses testified, and to make use of the remaining time, the court permitted the state to call Baker, a rebuttal witness. Baker testified that she was the original owner of the Rohm and that it had not fired when she had attempted to shoot it in the air on a prior New Year's Eve. The next morning, the defense presented the remainder of its case, calling a neighborhood store owner who was familiar with both Baines and petitioner. The defense did not, however, call Wong to the stand.[7] The defense also did **687 not call Reid, another ballistics expert that counsel had consulted.[8]
Following the presentation of evidence and the parties' closing arguments, the case went to the jury. The jurors deliberated for 15 hours and, at one point, asked for clarification of the definition of "reasonable doubt" and about when they should tell the court that the jury was hung. Ultimately, the jury returned a verdict of guilty for murder with a firearm.
Petitioner pursued a direct appeal, and his conviction was affirmed. State v. Farmer , 210 Or. App. 625, 152 P.3d 904, rev. den. , 342 Or. 645, 158 P.3d 508 (2007). Petitioner then sought post-conviction relief. He raised numerous issues, but, because of the conclusion we reach, only one is relevant here: Petitioner alleged that defense counsel failed to provide constitutionally adequate representation by deciding not to call Wong to testify.[9] The post-conviction court issued a letter opinion agreeing with petitioner, which noted that the Rohm analysis "was a critical piece of evidence in the case" and explained the court's reasoning as follows:
"The defense attorney has stated that, (1) despite the expert's findings that were very favorable to the defense[,] she did not realize that the defense expert's findings would be that much different than the State's findings when presented at trial. Further, she decided not to call the forensic expert as a witness because the expert did not have the training and experience to withstand cross examination. ***
"Although tactical choices by a trial lawyer do not usually provide grounds for post-conviction relief, relief may be available if [petitioner] shows the decisions of counsel were not based on a reasonable evaluation of costs and benefits, or a reasonable *176 evaluation of the evidence. In a **688 cost versus benefit analysis undertaken by a reasonable attorney, a reasonable attorney would have called Wong to testify as a defense expert. Regardless of the ability of the State to impeach his credentials, even if he were impeached regarding the analysis of the bullet fragment lands and grooves, his testimony when combined with the State expert Grover's testimony would be: one expert who testified that the Rohm revolver could have been the weapon that fired the bullet that killed Monterroso and one expert who testified that the Rohm revolver was likely [the] weapon that fired the bullet that killed Monterroso. Therefore, what was the down side of calling Wong to testify?
"* * * * *
"[T]here is no physical evidence tying [petitioner] to the crime; there is evidence that someone else shot the victim; there is evidence that the other suspect and [petitioner] are close enough alike in looks that one can be easily confused with the other; there is evidence that the potential murder weapon was found at a home where the other suspect had been sleeping; [petitioner's] alleged 'confessions' do not match the forensics, and the jury was out deliberating for 15 hours, this Court finds that the decision to not place Wong's testimony before the jury caused prejudice to [petitioner]."
Accordingly, the post-conviction court ordered that petitioner receive a new trial.
The state[10] appealed the post-conviction judgment. In a divided decision, the majority of the Court of Appeals held that the post-conviction court erred in its conclusion. Farmer v. Premo , 283 Or. App. 731, 733, 390 P.3d 1054 (2017). The court reasoned that the post-conviction court had wrongly focused on whether the choice not taken by defense counsel had no " 'downside,' " or whether a reasonable attorney could have come to a different conclusion. Id. at 747, 390 P.3d 1054 (quoting Green v. Franke , 357 Or. 301, 314, 350 P.3d 188 (2015) ). Instead, the court said, the post-conviction court should have focused on "whether no attorney exercising reasonable professional skill and judgment could have **689 made the tactical choice that trial counsel did, such that the choice reflects an absence or suspension of professional skill and judgment." Id. Under that evaluative measure, the court determined that defense counsel's decision not to call Wong did not amount to inadequate assistance of counsel. Id. at 748, 390 P.3d 1054. The court explained that defense counsel's decision was grounded in a reasonable investigation and that defense counsel had weighed the costs and benefits of calling Wong. Id. at 747, 390 P.3d 1054. Specifically, the court explained that defense counsel hired experts to investigate the ballistics issue and consulted those experts in deciding whether to present Wong's testimony to the jury. Id. Also, the court further explained, there were tactical advantages in not presenting Wong's testimony if it might detract from the defense's case. Id. at 747-48, 390 P.3d 1054.
The dissent took a different view. It distinguished between defense counsel's decision to investigate potential expert witnesses and her choice "not to use the fruits of her investigation." Id. at 772 n. 1, 390 P.3d 1054 (Ortega, J., dissenting). The latter, the dissent argued, was unreasonable because it was not based on " 'a reasonable evaluation of the likely costs and potential benefits.' " Id. at 774-75, 390 P.3d 1054 (quoting Stevens v. State of Oregon , 322 Or. 101, 109, 902 P.2d 1137 (1995) ). The dissent reasoned that Grover's concession that he could not rule out the Rohm as the murder weapon "was not an adequate substitute for Wong's" testimony, which "offered the jury an affirmative basis-otherwise lacking-for concluding that Baines was the shooter, not petitioner." Id. at 773, 390 P.3d 1054. That testimony, the dissent explained, would have enhanced Grover's acknowledgment that he could not exclude the Rohm as the murder weapon. Id. at 774, 390 P.3d 1054. The dissent would have held that defense counsel was inadequate in "depriving the jury of the opportunity to *177 hear and weigh testimony that offered an otherwise-missing affirmative expert opinion supporting the defense theory." Id. at 773, 390 P.3d 1054.
Petitioner filed a petition for review in this court, which we allowed. He renews his argument that defense counsel was constitutionally inadequate in deciding not to present Wong's testimony to the jury. For the reasons that follow, we agree.
**690 II. ANALYSIS
Article I, section 11, of the Oregon Constitution guarantees a criminal defendant the right to adequate counsel. A person who seeks post-conviction relief and alleges that she was denied that right must establish by a preponderance of the evidence that counsel failed to exercise reasonable professional skill and judgment, and that she was prejudiced as a result. Gorham v. Thompson , 332 Or. 560, 564, 34 P.3d 161 (2001).
In this case, petitioner argues that, assessed in light of the fact that he was a teenager facing a life sentence in a case where there was evidence of his innocence, defense counsel failed to render reasonable skill and judgment in deciding not to call Wong. Petitioner acknowledges that that decision was a tactical decision, and he recognizes that such a decision is, "in the abstract, *** deserving of considerable deference." Lichau v. Baldwin , 333 Or. 350, 360, 39 P.3d 851 (2002) ; see Gorham , 332 Or. at 567, 34 P.3d 161 (stating that reviewing court "will not second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment"). However, as petitioner notes, "the fact that a lawyer has made a 'tactical decision' does not mean that the lawyer's choice meets the constitutional standard for adequate assistance of counsel." Stevens , 322 Or. at 109, 902 P.2d 1137. Tactical decisions, to be considered an exercise of professional skill and judgment, "must be grounded on a reasonable investigation," Gorham , 332 Or. at 567, 34 P.3d 161, and should include an evaluation of " 'the likely costs and potential benefits of the contemplated action,' " as measured in light of the nature and complexity of the case, Lichau , 333 Or. at 360, 39 P.3d 851 (quoting Stevens , 322 Or. at 109, 902 P.2d 1137 ).
Petitioner contends that, in this case, defense counsel did not conduct a reasonable investigation because she did not accurately assess the benefits of Wong's testimony, rendering her assistance constitutionally inadequate. Specifically, petitioner argues that the post-conviction court made a factual finding that defense counsel mistakenly believed that Wong's testimony essentially would be the **691 same as Grover's and made her tactical decision to have Wong not testify based, at least in part, on that inaccurate assessment. That finding, petitioner asserts, is supported by the record and is binding on this court. See Ball v. Gladden , 250 Or. 485, 487, 443 P.2d 621 (1968) (noting that findings of fact are binding on this court if there is evidence in the record to support them); State v. Breen , 250 Or. 474, 476, 443 P.2d 624 (1968) (same).
The state's response is two-fold. First, the state contends that the post-conviction court did not make a finding of fact that defense counsel believed that Wong's testimony would be duplicative of Grover's. Read in context, the state asserts, the post-conviction court merely paraphrased defense counsel's reasons for not calling Wong, which she explained in more detail and more correctly in her deposition testimony. The state argues that nothing in the court's ruling indicates that the court disbelieved counsel when she stated in her deposition that she knew that Wong's report used the term "likely," and that testimony to that effect would be stronger than Grover's. Second, the state argues that, even if the post-conviction court found that defense counsel failed to appreciate the difference in the experts' views, that failure does not demonstrate that counsel acted unreasonably.
Our review of the record convinces us that the post-conviction court made a deliberate factual finding that counsel did not understand that Wong's testimony would be significantly different than Grover's. After the post-conviction hearing, the post-conviction court issued a letter opinion that included the following:
*178 "However, when the expert the defense hired found that the bullet fragment was likely fired from the gun found at Baines' home ... the defense chose not to call their expert as a witness. Now facing allegations of ineffective assistance of counsel, the defense attorney states that, despite the expert's findings that were very favorable to the defense, she did not realize that the defense expert's findings would be that much different than the State's findings when presented at trial ."
**692 (Emphasis added.)[11] The state filed a written objection to the finding that defense counsel "did not realize that Wong's findings would be much different from the State's findings." The state argued that, although there was evidence suggesting that that was true, the record also demonstrated that counsel knew that Wong's findings were more favorable than Grover's. The state discussed the evidence that supported its conclusion and attempted to explain contradictory evidence. The state also asserted that the post-conviction court's use of the phrase "[n]ow facing allegations of ineffective assistance of counsel" indicated that the court did not believe that defense counsel did not realize the strength of Wong's testimony. The state requested that the post-conviction court amend its findings to provide as follows:
"The defense knew Wong's findings would be stronger than the State's findings, but as explained in her deposition, the defense attorney felt that Mr. Wong would not withstand cross examination because he didn't have the appropriate training and experience."
(Emphasis in original.)
The post-conviction court held a hearing on the state's motion, during which the state reiterated its request that the court's findings reflect defense counsel's knowledge that Wong's testimony with respect to the Rohm "would be stronger than" Grover's. The post-conviction court rejected that request, however.[12] It issued an amended opinion, which omitted the "[n]ow facing allegations of ineffective assistance of counsel" phrase but otherwise remained largely unchanged:
"However, when the expert the defense hired found that the bullet fragment was likely fired from the gun found at Baines' home ... the defense chose not to call their expert as a witness. The defense attorney has stated that, (1) despite the expert's findings that were very favorable to the defense[,]
**693 she did not realize that the defense expert's findings would be that much different than the State's findings when presented at trial."
(Emphasis added.)
From that sequence of events, we conclude that the post-conviction court was well-aware that it was making a finding of fact that defense counsel did not fully understand the significance of the distinction between the findings to which the two experts would testify. We are bound by that factual finding if there is evidence in the record that supports it. Ball , 250 Or. at 487, 443 P.2d 621.
In examining that issue, we must assess the two facts on which the court based its conclusion that defense counsel was inadequate: (1) that Wong's findings were different and more favorable than Grover's, and (2) that defense counsel "did not realize" that those findings "would be that much different" from Grover's. Both facts are supported by the record. First, there is evidence to support the finding that Wong's anticipated testimony would have been stronger than Grover's. The most the defense could have made of Grover's testimony was to show that the Rohm could not be ruled out as the murder weapon. Considering Grover's testimony about the hundreds of thousands of guns in the Portland area that also could have been used to kill Monterroso, Grover's conclusion was not particularly helpful to petitioner. In effect, Grover's testimony demonstrated that *179 the Rohm was no more likely than hundreds of thousands of other guns to be the murder weapon. By contrast, Wong's testimony would have been that, even among the hundreds of thousands of guns that could possibly be the murder weapon, the Rohm was "likely" it, establishing an affirmative link between the Rohm and the murder. Although both experts' findings were inconclusive-insofar as neither Grover nor Wong could say definitively whether the Rohm was the murder weapon-there was evidence from which the post-conviction court could find that there was a significant distance between the two expert's positions. The post-conviction court's finding that Wong's testimony was different from and stronger than Grover's is supported by the record. **694 There also is evidence to support the post-conviction court's finding that defense counsel did not fully appreciate that difference.[13] That evidence comes primarily from four sources: (1) defense counsel's 2008 letter to the Bar in response to petitioner's bar complaint; (2) the complaint summary issued by the Bar; (3) Wong's affidavit submitted as part of this post-conviction case; and (4) the deposition of defense counsel taken as part of this post-conviction proceeding. The first three sources directly lend support to the finding of the post-conviction court. In defense counsel's 2008 letter, she stated, "It is my recollection that I did not call Mr. Wong as a witness because he would have reiterated the state's expert witness testimony and he was not necessarily more qualified in terms of ballistics testing and examination." The Bar's complaint summary noted that "[t]he experts [that defense counsel] retained supported [the] defense theory, but she decided not to offer their testimony at trial because it was duplicative of testimony by the state's expert." And, in his affidavit, Wong stated that defense counsel "told me that I was not needed because the State's expert had testified and that his conclusions were the same as mine."
Although defense counsel's statements during her deposition could support a different interpretation,[14] the post-conviction court, as explained above, did not credit them. We conclude that that court's finding that counsel did not grasp the significance of Wong's anticipated testimony is supported by the record and now turn to the state's alternative argument that counsel nevertheless rendered adequate assistance in representing petitioner.
**695 The state argues that defense counsel's decision not to call Wong was grounded in a reasonable investigation: It was made after consulting with two experts-Wong and Reid-and based on reasonable concerns, specifically Wong's qualifications and a concern that, if counsel tried too hard to prove that the Rohm was the murder weapon, then the state would put on more evidence establishing that the gun was not operable and could not have served that function. Petitioner responds that it was not enough for defense counsel to consult experts in bullet comparison. Rather, petitioner contends, defense counsel's charge was to accurately assess the expert's findings in order to make an informed decision about whether and how to use them.
As we understand the parties' arguments, they address different issues. The state focuses on the fact that defense counsel weighed the costs and benefits of calling Wong. Petitioner focuses on the fact that, when she did so, defense counsel did not make a reasonably accurate assessment of those costs and benefits. Thus, this case raises *180 the following question: To render constitutionally adequate assistance of counsel, is it enough for counsel to gather the requisite information about the facts and law and weigh them to make a given tactical decision, or must counsel also have a reasonably accurate understanding of the facts and law that go into that analysis? That is a question we have not explicitly answered, but it is one that we have implicitly addressed.
In Lichau , the petitioner, who was in the military, was accused of raping his niece. 333 Or. at 352, 39 P.3d 851. The petitioner planned to present an alibi defense that would have shown that he was in North Carolina at a military base at the time of the alleged rape. Id. at 352-53, 39 P.3d 851. On the morning of trial, though, the petitioner's defense counsel, McCrea, decided not to proceed with the alibi defense because the prosecutor had told McCrea that the state had proof that the petitioner was in Oregon at the time of the rape on a special kind of leave-"basket leave"-that does not show up on military records. Id. at 353, 39 P.3d 851. McCrea asked for proof, but the prosecutor did not turn any over; nor did the prosecutor present any evidence concerning that issue at trial. Id.
**696 The petitioner pursued post-conviction relief, contending that McCrea's representation had been constitutionally inadequate when he withdrew the petitioner's alibi defense. Id. at 353-54, 39 P.3d 851. The petitioner argued that that decision was not based on a reasonable investigation of potential alibi witnesses or the petitioner's military records. Id. at 354, 39 P.3d 851. In fact, McCrea had relied only on documents provided by the prosecution and the assistance of the petitioner's military attorney in assessing the viability of an alibi defense. Id. Had McCrea investigated the matter beyond those sources, he would have discovered, among other things, that, according to the petitioner's platoon commander, "basket leave" was not available to members of his unit at the time of the alleged rape. Id. at 355, 39 P.3d 851. This court agreed with the petitioner that McCrea had provided inadequate assistance, noting that McCrea's decision to withdraw the alibi defense had been based on his belief that the prosecution had evidence that compromised the defense. Id. at 362, 39 P.3d 851. The court reasoned that, because of McCrea's "unreasonably limited pretrial investigation, *** [he] lacked the information necessary to evaluate properly the prosecutor's threat," and he was therefore not " 'equipped to advise his client, exercise professional judgment and represent [the petitioner] in an informed manner.' " Id. (quoting Krummacher v. Gierloff , 290 Or. 867, 875, 627 P.2d 458 (1981) ).
Similarly, in Richardson v. Belleque , 362 Or. 236, 238, 406 P.3d 1074 (2017), the petitioner challenged his counsel's performance during a presentencing hearing, the purpose of which was to determine whether the petitioner was a dangerous offender who suffered from a "severe personality disorder." Counsel did not investigate records regarding the petitioner's background or consult an expert before the hearing; nor did counsel call a defense expert to testify at the hearing. Id . Instead, counsel decided to rely on a cross-examination of the state's psychiatrist, Suckow, to cast doubt on his opinion that the petitioner suffered from a severe personality disorder. Id. at 243-44, 406 P.3d 1074. In post-conviction proceedings, the petitioner alleged that his counsel had failed to conduct an investigation to support his decision not to obtain his own psychological evaluation to rebut the opinions of the state's psychiatrist. Id. at 248, 406 P.3d 1074. This court agreed:
**697 "[A]lthough defense counsel asserted that he had made a calculated strategic decision that this was one of the minority of cases in which it was preferable not to rely on a defense expert, he did so without adequate knowledge of the underlying facts. *** [A]dequate counsel in this situation would have gained further information about petitioner's psychological conditions and juvenile history and consulted with a defense expert in the field of psychology to determine how best to counter Suckow's evidence that petitioner suffered from an antisocial personality disorder."
Id. at 262, 406 P.3d 1074.
In both Lichau and Richardson , the attorneys made decisions without gathering adequate information, and we determined *181 that, under the circumstances of those cases, their failure to do so rendered their assistance constitutionally inadequate. We see little difference between failing to gather information and failing to understand its import. In ensuring that individuals receive the legal assistance that the constitution requires, it would make little sense to demand that attorneys gather sufficient information to make a decision, but not require them to reasonably understand and assess it. After all, the purpose of requiring attorneys to make a reasonable investigation is to enable them to reasonably consider the costs and benefits of pursuing a given action and thus permit them to make an informed decision. See Lawhorn v. Allen , 519 F.3d 1272, 1295-96 (11th Cir. 2008) (determining that counsel's decision to waive closing argument in penalty hearing based on a "gross misunderstanding" of criminal procedure and that counsel thus was unable to make a reasonable strategic decision); Toliver v. McCaughtry , 539 F.3d 766, 775 (7th Cir. 2008) (determining that "counsel could not have made a reasonable strategic decision not to call [the witness] without interviewing him in order to evaluate his proposed testimony, his credibility or his demeanor").
A case on which the state relies, Montez v. Czerniak, 355 Or. 1, 322 P.3d 487 (2014), does not hold to the contrary. In Montez , the petitioner pursued post-conviction claims against his attorneys for their representation at the petitioner's penalty-phase retrial. Id. at 3, 322 P.3d 487. One of those claims related to his attorneys' decision to have the judge instruct the jury **698 that the petitioner was sentenced to death after his first trial. Id. at 25, 322 P.3d 487. The defense team believed that the instruction was necessary because it would "become very clear that [the petitioner] was on death row" and that the defense would need to offer an explanation of the evidence that the state was going to present against the petitioner concerning his activity in prison. Id. The petitioner agreed with that choice and wanted the jury to know that he had been on death row. Id. at 25-26, 322 P.3d 487. The trial court thus instructed the jury that the petitioner had been sentenced to death in his first trial. Id. at 26, 322 P.3d 487. The petitioner was again sentenced to death at the penalty phase retrial, and he alleged in post-conviction proceedings that his attorneys rendered inadequate assistance of counsel when they decided to disclose to the jury that he had been sentenced to death after his first trial. Id. The Court of Appeals disagreed with the petitioner and, in doing so, noted considerations that would support counsel's decision in addition to those that they articulated. Id. at 26-27, 322 P.3d 487.
Before this court, the petitioner argued that, under both the federal and state constitutions, the Court of Appeals should have focused on "counsel's actual strategic reasoning," and that it was "precluded from focusing on strategies that defense counsel could reasonably have had in mind in deciding to reveal [the] petitioner's prior death sentence." Id. at 27, 322 P.3d 487 (emphasis in original). To permit the court to do so, the petitioner argued, would be to allow "post hoc rationalization of counsel's conduct, rather than an accurate description of their deliberations." Id. This court agreed with the petitioner, insofar as not permitting a court to "indulge in post hoc rationalizations of trial counsel's decisions that contradict the evidence derived from their actions." Id. We concluded, however, that that was not what had occurred in the case before us:
"[D]efense counsel discussed with the trial court the strategic reasons for disclosing [the] petitioner's previous death sentence, and [the] petitioner himself agreed with their reasoning. Other lawyers might disagree with that strategic choice, but the choice itself was made with appropriate consideration of the risks and benefits, and we cannot say that it was unreasonable."
Id.
**699 Montez stands for the proposition that, when the record supports a conclusion that an attorney made a choice after correctly considering the costs and benefits of that decision, it is not error for a reviewing court to discuss other considerations that counsel also could have considered in deciding whether counsel's representation was constitutionally adequate. However, Montez does not suggest that, when an attorney's decision is based in part on inaccurate or inadequate *182 information, a court can simply disregard that deficiency and focus only on other accurate information that the attorney considered or may have considered. For instance, an attorney might testify that she had made a decision not to call a witness-who in truth was an eye-witness-for two reasons, one of which was her mistaken belief that the witness would rely on hearsay rather than direct observation. A post-conviction court would not be required to deny a petitioner's claim based on a finding that counsel had weighed the question of whether to call the witness. Montez stands for the proposition that an attorney must make that decision with "appropriate consideration of the risks and benefits." 355 Or. at 27, 322 P.3d 487 (emphasis added). An appropriate consideration of the risks and benefits of a strategic decision requires a reasonably accurate and adequate consideration of the facts produced by an investigation.[15]
In this case, the post-conviction court found that defense counsel had two reasons for her decision not to call Wong: her mistaken understanding that Wong's testimony would not be stronger than Grover's, and her concerns about Wong's qualifications. The fact that defense counsel **700 misunderstood was an important fact in the cost-benefit analysis. Defense counsel's reservations about Wong's qualifications may have permitted her to decide that those concerns outweighed the benefit of calling Wong, but she could not make that determination without a reasonably accurate understanding of the benefit she would gain by calling him.[16] Adequate counsel in this situation would have understood the different nature and greater strength of Wong's potential testimony as compared to Grover's and would have made a decision about whether to call Wong after considering that benefit. Given that defense counsel did not have that understanding, the post-conviction court did not err in concluding that she failed to exercise the professional skill and judgment Article I, section 11, requires.[17]
Not all instances of inadequate assistance of counsel warrant reversal, however. Lichau , 333 Or. at 363, 39 P.3d 851. Under Article I, section 11, where the effect of an attorney's failure during a jury trial is at issue, only those errors that "could have tended to affect" the outcome of trial require such action. Green , 357 Or. at 322, 350 P.3d 188. In that instance, a petitioner must demonstrate "more than mere possibility, but *183 less than probability," that counsel's error affected the verdict. Id. Specifically, in a "failure to investigate" case, a petitioner must show that there is "more than a mere possibility" that competent counsel "could have used" the information that counsel failed to uncover or understand in a way that " 'could **701 have tended to affect' " the outcome of trial. Richardson , 362 Or. at 266, 406 P.3d 1074 (quoting Green , 357 Or. at 323, 350 P.3d 188 ).
In this case, petitioner's defense centered on whether petitioner or Baines was the shooter. Petitioner contends that the state's evidence against petitioner was not very strong, and he notes that the jury deliberated for over 15 hours, asking for clarification of "reasonable doubt" and when to inform the court if it was unable to reach a verdict. Petitioner argues that there is more than a mere possibility that competent counsel could have used Wong's testimony in a way that could have tended to affect the jury's verdict.
The state responds that petitioner could not have been prejudiced by defense counsel's failure because there was "overwhelming evidence" at trial that the Rohm was not operable. The state contends that the jury could believe that the Rohm was the murder weapon only if it (1) believed that the witnesses who testified about the gun's operability were lying or mistaken, or (2) believed that the gun did not work before and after the murder but worked during it. The state argues that those scenarios are implausible.
The state may be correct that, in the end, petitioner would not be able to convince a jury that Baines committed the murder or that he did so with the Rohm; however, that does not mean that the fact that the Rohm was "likely" the murder weapon was not evidence that could have tended to affect the jury's verdict. Wong's testimony would have complemented the other evidence that petitioner produced that Baines, not petitioner, committed the murder. It also would have challenged Grover's testimony, which not only undercut the defense's Baines theory but also bolstered the state's theory that a .357 revolver was the murder weapon.
Moreover, the usefulness of Wong's testimony in a case like this could have been significant. As the post-conviction court noted, there was no physical evidence tying petitioner to the murder. The primary evidence against petitioner was that a witness placed him in the area before the murder, that another identified him as the shooter, and that he made several admissions that he had committed the murder. There was evidence that cast doubt on the reliability and credibility of those witnesses, and petitioner's **702 admissions differed from the forensic evidence. There also was evidence that Baines was a suspect in the murder, that he resembled petitioner, and that the Rohm, which could not be ruled out as the murder weapon, was discovered at his residence. We conclude that there is more than a mere possibility that adequate counsel could have used Wong's testimony in a way that could have had a tendency to affect the jury's verdict.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

The facts are taken from the post-conviction court's opinion, which quotes the facts as discussed in petitioner's direct appeal, State v. Farmer , 210 Or. App. 625, 152 P.3d 904, rev. den. , 342 Or. 645, 158 P.3d 508 (2007). The post-conviction court supplemented those facts where it deemed necessary.

Thompson was driving down the street when the shooting happened and pulled over to call 9-1-1 on her cell phone, at which point the shooter and his accomplice ran right past her. Thompson was unable to be located during the investigation and trial, but the recording of her 9-1-1 call was played for the jury. In that call, Thompson describes the shooter as Hispanic. After petitioner's trial, the defense was able to locate Thompson. She described the shooter as a black male and, when shown the same photo lineups that other witnesses were shown, stated that petitioner "was definitely not the shooter or the other person who ran by me." She further stated that she was shown two pictures of Baines-the person who the defense asserted had actually committed the murder-and that he "most closely resembles the person I refer to as the 'shooter.' " Petitioner sought a new trial as a result of Thompson's statements, but the trial court denied the motion for reasons explained in greater detail in Farmer , 210 Or. App. 625, 152 P.3d 904. One of petitioner's claims of inadequate assistance of counsel relates to defense counsel's representation during the motion for a new trial. The post-conviction court granted him relief with respect to the error petitioner identified with counsel's performance at that hearing, but the Court of Appeals reversed. Given that we grant petitioner relief on a separate issue, we do not address petitioner's argument about counsel's performance during the motion for a new trial.

Baines split time between that house and his girlfriend's house.

We note that the record contains two spellings of this witness's last name: "Grover" and "Gover." We refer to him as "Grover" because that is how he spelled his name when being sworn in to testify during the prosecution's case-in-chief.

Much of the background information that follows was not discussed in the post-conviction court's letter opinion. However, it is undisputed information that comes from the record. See Montez v. Czerniak , 355 Or. 1, 8, 322 P.3d 487 (2014) (noting that appellate court can consider facts that are not explicitly found by the post-conviction court but that are consistent with the post-conviction court's conclusions of law).

Muldrew testified that petitioner used a .357 revolver to commit the murder. No such weapon was ever discovered in this case.

After the defense called its last witness, the prosecution presented the remaining evidence of its rebuttal case, which included testimony from Waller, Baker's daughter and the owner of the Rohm at the time police seized it, and Dan Alessio of the Oregon State Police. Waller testified that the Rohm did not work; Alessio testified that the Rohm had had to be repaired before it could be test-fired.

Reid had more experience in forensic bullet comparison than Wong. The record indicates that counsel also hired Reid to analyze the results of the test-firing but that Reid did not prepare a formal report of his analysis. The record suggests that Reid would not have testified to the same conclusion that Wong reached.

Petitioner raised both state and federal claims of inadequate assistance of counsel. Because we decide in petitioner's favor on his state constitutional claim, we do not address his federal constitutional claim.

For ease of reference, we will refer to the superintendent as "the state." See Richardson v. Belleque , 362 Or. 236, 238 n. 1, 406 P.3d 1074 (2017) (referring to superintendent as "the state").

The opinion concluded by instructing petitioner to "prepare the appropriate form of order." Petitioner seems to have drafted such an order; however, that order does not appear to have been included in the record.

In the transcript of the proceeding, there is some discussion that could be understood as the court acknowledging that counsel knew that Wong's testimony would be stronger. That understanding of the transcript is not supported by the amended opinion that the post-conviction court later issued.

Much of the evidence that supports this finding also could suggest that defense counsel did not understand that there was any difference at all between the testimony of the two experts.

Defense counsel's deposition statements point in both directions with respect to whether she understood that Wong's testimony would have been stronger than Grover's. On the one hand, defense counsel's deposition statements suggest that she viewed Wong's anticipated testimony as more helpful than Grover's. On the other hand, her statements could be interpreted to suggest that she did not fully understand the difference between Wong's and Grover's findings. For instance, defense counsel stated that she was concerned that the state would just elicit from Wong that he "could not conclusively say that [the Rohm] was the firearm" that killed Monterroso and that that would just be a "rehashing [of] the same testimony of Travis Grover," which defense counsel determined "was the best testimony [the defense] could get regarding [the] gun."

Another case that the state cites, Gorham , 332 Or. 560, 34 P.3d 161, is also consistent with this conclusion. In Gorham , an attorney who had represented the petitioner in his second trial decided not to call defense experts in the petitioner's third trial after (1) learning from a juror from the second trial that the state had thoroughly discredited the defense experts and (2) learning that the state was going to present at the third trial the same case it had presented at the second. Id. at 563, 34 P.3d 161. This court held that that decision was grounded in a reasonable investigation because, among other things, counsel had investigated and used the experts only a few months earlier at the petitioner's second trial and because nothing had occurred after the second trial that would have compelled counsel to investigate anew. Id. at 567-68, 34 P.3d 161. The problem with state's reliance on Gorham for its position here is that, unlike the attorney in that case, defense counsel in this case did not reasonably understand her expert's testimony. That lack of knowledge prevented her from reasonably weighing the costs and benefits of her proposed decision and thus from making a reasonable strategic decision.

Wong did not have specific training in firearms forensics, but the trial court indicated that it would qualify him to testify as an expert on that topic. Had he testified, Wong's report demonstrates that his disagreement with Grover was based on his knowledge and experience as a forensic engineer. For example, Wong, like Grover, determined that bullets fired from the Rohm and the fatal bullet had agreement on all class characteristics. Yet Wong noted that the Rohm is a "relatively uncommon model of revolver in the United States" that has class characteristics that are different from more common revolvers. Grover's testimony did not touch on that fact.

In reaching our conclusion, we note that the Court of Appeals was correct that the standard for determining the adequacy of counsel is not whether a given decision, viewed in isolation, had no "downside," or whether a reasonable attorney could come to a different conclusion. Farmer , 283 Or. App. at 747, 390 P.3d 1054. The Court of Appeals was mistaken, however, in focusing on whether defense counsel engaged in the weighing process rather than also considering whether counsel reasonably understood the facts that she weighed. We note that petitioner's arguments are more fully developed in this court than they were before the Court of Appeals.