Argued and submitted June 1, 2021; reversed and remanded as to claim regarding trial counsel's failure to impeach Smith, otherwise affirmed May 18, 2022

JASON JAY JAYNES,
*Petitioner-Appellant,*

*v.*

Brad CAIN,
Superintendent,
Snake River Correctional Institution,
*Defendant-Respondent.*

Malheur County Circuit Court
17CV30558; A169945

511 P3d 58

Petitioner appeals from a judgment denying him post-conviction relief from his convictions related to the sexual abuse of three minors. On appeal, petitioner assigns error to the post-conviction court's denial of one of his inadequate assistance of counsel claims as to three of those convictions, arguing that his counsel's failure to impeach a witness for the state deprived him of adequate assistance of counsel under Article I, section 11, of the Oregon Constitution. *Held*: Trial counsel's failure to impeach the state's witness regarding that witness's subjective expectation of a future favor in exchange for his testimony was not a reasonable exercise of professional skill and judgment, and there was more than a mere possibility that counsel's failure could have affected the relevant verdicts. Accordingly, the post-conviction court erred in denying relief for those convictions.

Reversed and remanded as to claim regarding trial counsel's failure to impeach Smith; otherwise affirmed.

J. Burdette Pratt, Senior Judge.

Jason Weber argued the cause for appellant. Also on the brief was O'Connor Weber LLC.

Christopher Page, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Mooney, Presiding Judge, and Hellman, Judge, and DeVore, Senior Judge.*

_____

* Hellman, J., *vice* DeHoog, J. pro tempore.

HELLMAN, J.

Reversed and remanded as to claim regarding trial counsel's failure to impeach Smith; otherwise affirmed.

**HELLMAN, J.**

Petitioner appeals from a judgment denying him post-conviction relief from his convictions related to the sexual abuse of three minors. On appeal, petitioner assigns as error the post-conviction court's denial of one of his inadequate assistance of counsel claims as to three of those convictions, arguing that his trial counsel's failure to impeach a witness for the state deprived him of adequate assistance of counsel under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. For the reasons below, we agree with petitioner that counsel's performance was deficient and that counsel's failure to impeach the witness prejudiced petitioner, that is, the failure had a tendency to affect the outcome of the trial for the challenged counts. Accordingly, we conclude that the post-conviction court erred in denying relief for those convictions and reverse and remand.

## I.  FACTS

We state the relevant facts consistently with the post-conviction court's express and implicit findings. *Davis v. Kelly*, 303 Or App 253, 263, 461 P3d 1043, *rev den*, 366 Or 826 (2020).

In 2013, petitioner was charged with 18 counts of sexual offenses involving three minor victims. As relevant to this appeal, five of those counts involved defendant's alleged assault of a 12-year-old victim, A, on March 22, 2000. Those were Count 1 (using a child in a display of sexually explicit conduct), Count 3 (second-degree rape), Count 4 (second-degree sodomy), and Counts 5 and 6 (first-degree sexual abuse).

While in jail awaiting trial on those charges, defendant was placed in an inmate "pod" with Craig Smith. Smith was facing charges related to the injury of one of his children. Smith pleaded guilty to criminal mistreatment on December 27, 2013. After pleading guilty, but before his sentencing on December 31, 2013, Smith informed his lawyer that petitioner had made incriminating statements to him while they were sharing a pod; the statements concerned

petitioner's sexual offense charges and petitioner's involvement in a murder.

On the morning of Smith's sentencing, police officers interviewed Smith, who told the officers that petitioner had admitted his guilt on the sodomy charge concerning the "younger" victim, who petitioner described as being "really young," and had described an instance of sodomizing that victim but had denied having sex with her because "the bitch wouldn't give it up." Smith also told officers information that Smith could not have learned by reading police reports related to petitioner's alleged crimes, including that petitioner told Smith that he gave a "high five" to another man as he left the bedroom where he had sex with A. During that interview, Smith told officers that the way petitioner spoke about the victims gave him "goose bumps," which was one of the reasons that he came forward. Smith also answered "right" and "correct" when asked to confirm that "there's nothing that you expect from the DA's office in exchange for providing this information."

Smith was sentenced later that day in accordance with the plea agreement that he had entered into before he disclosed the conversations with petitioner.

On January 7, 2014, a detective called Smith to ask follow-up questions regarding his conversations with petitioner. When asked why he reached out to his attorney to contact investigators, Smith said that he brought petitioner's statements up with his attorney because he was concerned that he may be "guilty by association" if he did not disclose his knowledge of petitioner's confessions but reiterated that he did not expect anything in return and came forward because he "thought it was [his] moral obligation to let somebody know about it[.]"

At the end of the January 7 call, Smith brought up the custody of his children. He stated:

"You know, you know my lawyer did say that you guys, you guys kind of owed me a favor for this? Like, you know, like a favor, but like, you know, something that, you know, could be being of use for me. Can, and one thing I was wondering if, is if, you know, the, my whole thing with my custody case. You know it's looking like I'm probably not going

to get custody 'cause of the spanking thing, and I, and I understand that.

"* * * * *

"But, you know, I mean, uh, it's just, it just sucks being stuck in the situation that I'm in with, uh, my sex offense and, you know, having a felony now.

"* * * * *

"And, you know, like, I mean I thought I was gonna be a player in all this, like, being able to be with my kids and stuff like that. But, I can't even see 'em right now because the, the judge, the judge made a rule saying that I could, could see the kids as long as it was okay with my PO * * * and DHS."

The detective told Smith that he could not help him or give a favor, commended him for coming forward out of a "moral obligation," and told Smith to speak to his PO or attorney about his custody case.

At petitioner's bench trial, the three victims, others present at the house on March 22, 2000, and Smith testified. One of the victims, L, testified that petitioner picked her, A, and another girl, E, up from their foster home on the night of March 22 and drove them to petitioner's friend's home. E testified that at that home, A and L drank alcohol to the point of visible intoxication and that she believed they were also given ecstasy. E testified that she remained sober at the home and identified petitioner as the person who had oral sex with A and later high fived another male after leaving the bedroom where A was undressed and intoxicated.

A testified that she was at the house on March 22 and remembered having sex with an "older" male, but that she was "pretty wasted" and could not identify petitioner as the person who she had sex with.

Smith testified on behalf of the state as to the conversations he had with petitioner in which petitioner admitted to sodomizing A. Toward the end of Smith's testimony, the prosecutor asked Smith if he had received "any kind of special treatment from the District Attorney's Office in order to get [him] to testify about" petitioner's confessions. Smith responded that, other than being flown from Minnesota and

put up in a hotel in order to testify, he had not received any benefit. Smith clarified that he had signed his plea deal before speaking to his lawyer about petitioner's statements and that his sentence was not affected by his cooperation.

On cross-examination, petitioner's trial counsel asked Smith whether it was "fair to say that [he] came forward with this information because [he was] offended by what [petitioner] did—or what [petitioner] said he did?" Smith answered that he "came forward with the information because [he] felt [he] had an obligation [due] to that." Petitioner's trial counsel then questioned Smith about his own previous conviction for third-degree sexual abuse and attempted to equate that crime to petitioner's charges. Smith distinguished himself from petitioner on the ground that he did not "speak about [his] victim" in the same negative way, which also motivated him to report his conversations with petitioner. Trial counsel did not attempt to directly impeach Smith by using Smith's request for a possible favor in his custody case to suggest that Smith had a motivation to fabricate petitioner's confessions.

The defense theory was that petitioner was not present at the home. In support of that defense, trial counsel called two witnesses who were also in custody with petitioner. Both testified that they were friendly with petitioner but never heard him talk about his own case. Trial counsel's closing argument focused on the unreliability of the witnesses' memories who had placed petitioner at the home. He did not directly address Smith's credibility.

As relevant to this appeal, the trial court found petitioner guilty of Counts 4, 5, and 6 concerning A—one count of second-degree sodomy and two counts of first-degree sexual abuse. In explaining its guilty verdict on those counts, the trial court reasoned:

"[A]lthough the direct evidence from [A] was insufficient to prove anything other than her presence at the party on March 22, 2000, her testimony combined with that of others to prove some of the charges that concerned her.

"Specifically, I believed the testimony of Craig Smith, who I find to have been very brave in his decision to come forward and reveal what he learned from [petitioner's] own

lips while they were in jail together. I believe that [petitioner] told Mr. Smith that he is, quote, 'definitely guilty' of the crime of Sodomy against the, quote 'really young' victim, and it is very clear from all the testimony, and even from her physical appearance yesterday on the witness stand, that [A] has always appeared much younger than her years, and younger than the other named victims in all respects.

"I also believe that [petitioner] admitted to Mr. Smith that the younger girl, quote, 'had a really nice box,' was, quote, 'very hot,' and that he fingered her and gave her oral sex and that she gave him oral sex. But that that was as far as it went, because in [petitioner's] words, quote, 'the bitch wouldn't give it up.'

"A confession in itself is insufficient under the law to support a conviction without corroborating evidence, but in this trial we do have some corroborating evidence, both from [A], who confirmed that she was at the party and having sex with someone, although she could not identify whom with any confidence, and from [E], who confirmed that [A] engaged in oral sex with [petitioner] at the party."

Relevant to this appeal, petitioner's post-conviction petition alleged that his trial counsel provided constitutionally deficient representation by failing to directly impeach Smith with Smith's statements regarding a possible favor in his custody case in exchange for testifying about petitioner's incriminating statements.

Petitioner's trial counsel testified at the post-conviction trial. He testified that his strongest defense strategy was to focus on the hazy memories of the victims and witnesses. Counsel testified that he had possessed and reviewed the transcripts of Smith's interviews at the time of trial, but that he did not recall Smith asking police for a favor in exchange for his help as a "player in all this." Counsel testified that he did not raise any possible benefits that Smith received in exchange for his testimony because he did not see a "meaningful benefit" after the prosecutor confirmed with Smith that he had not received a more lenient plea or sentence because of his testimony.

Although trial counsel did not directly challenge Smith's credibility in his closing argument at trial, he

testified that he chose to discredit Smith's testimony by instead calling other inmate witnesses who were closer to petitioner in custody to show that it was unlikely petitioner would have discussed his case with Smith, to whom he was not as close. He testified that he did not ask Smith about any possible favors received in exchange for his testimony because he believed Smith's sentence to be one that "one would normally get for that level of felony," because Smith entered his plea before talking with the police, and because Smith's attorney also testified that Smith did not receive any benefit for testifying.

The post-conviction court denied petitioner's claim for relief. The court reasoned that, because Smith did not in fact receive a benefit from the state for his testimony, failing to directly impeach Smith did not amount to deficient performance. The court also concluded that petitioner was not prejudiced by his trial counsel's failure to impeach Smith because the lack of credible evidence regarding any benefit received meant that there was "no evidence that trial counsel's failure to impeach Smith on that issue could have had a tendency to affect the results of the trial."

On appeal, petitioner renews his argument that he was deprived of constitutionally adequate counsel when trial counsel failed to impeach Smith regarding Smith's possible motivations to fabricate petitioner's confession. He contends that the post-conviction court erred in concluding otherwise. For the reasons below, we agree with petitioner.

## II. ANALYSIS

Under Article I, section 11, of the Oregon Constitution, a criminal defendant has the right to adequate counsel. *Farmer v. Premo*, 363 Or 679, 690, 427 P3d 170 (2018). "Similarly, the Sixth Amendment to the United States Constitution guarantees the right to the 'effective' assistance of counsel." *Sparks v. Premo*, 289 Or App 159, 168, 408 P3d 276 (2017), *rev den*, 363 Or 119, *cert den*, 139 S Ct 569, 202 L Ed 2d 407 (2018) (citing *Strickland v. Washington*, 466 US 668, 688, 104 S Ct 2052, 80 L Ed 2d 674 (1984)). Although we interpret and apply Article I, section 11, independently of the Sixth Amendment, the standards for determining the adequacy of legal counsel under both constitutions are "functionally

equivalent." *Johnson v. Premo*, 361 Or 688, 699, 399 P3d 431 (2017). In this case, state law is sufficient to decide the issues on appeal.

To be entitled to post-conviction relief based on a claim of inadequate assistance of counsel under Article I, section 11, a petitioner must prove two elements: first, that trial counsel failed to exercise reasonable professional skill and judgment, and second, that the petitioner suffered prejudice as a result of counsel's inadequacy. *Id.* at 699.

A.    *Reasonable Skill and Judgment*

We review the post-conviction court's determinations concerning adequate performance of counsel for errors of law. *Davis*, 303 Or App at 263. Because of the multiple variables that go into a criminal trial and the wide variety of ways in which counsel can effectively represent clients, *Krummacher v. Gierloff*, 290 Or 867, 873-74, 627 P2d 458 (1981), there is "no single, succinct, clearly defined standard for determining adequacy of counsel." *Stevens v. State of Oregon*, 322 Or 101, 108, 902 P2d 1137 (1995). Instead, the law provides "guidelines for the courts to use in the determination of each case," *id.*, so that a court can "assess each claim in the totality of the circumstances." *Krummacher*, 290 Or at 873-74 & n 5 (internal quotation marks omitted).

Petitioner raises a claim that counsel failed to use information that was known to him, so we evaluate whether counsel's "tactical decision" not to impeach Smith was a failure to exercise reasonable professional skill and judgment. A "tactical decision" is a "conscious choice by a lawyer either to take or omit some action on the basis of an evaluation of the nature and complexity of the case, the likely costs and potential benefits of the contemplated action, and other factors." *Stevens*, 322 Or at 109. An appellate court will not usually second-guess the tactical decisions of defense counsel in the course of representing a criminal defendant. *Id.* at 108. The fact that counsel made a "tactical choice," however, does not automatically mean that the constitutional standard for adequate counsel has been met. *Id.* at 109. When weighing the costs and benefits of taking or omitting an action in the course of a defense, counsel must make that decision with an "'*appropriate* consideration of the risks and benefits.'"

*Farmer*, 363 Or at 699 (quoting *Montez v. Czerniak*, 355 Or 1, 27, 322 P3d 487 (2014) (emphasis in *Farmer*)). Whether counsel's decision reflected an absence of reasonable professional skill and judgment is a question that turns on the facts known to counsel at the time that counsel made the decision. *Davis*, 303 Or App at 262.

Here, the post-conviction court concluded that counsel's performance was not deficient because there was no evidence that Smith received any benefit in exchange for his testimony against petitioner. Because of that, the post-conviction court reasoned that "[t]he trial judge would have seen through any attempt to impeach Smith in [that] manner." In essence, the post-conviction court found that a witness had to receive a benefit before impeachment was warranted.

However, a witness's potential bias is not limited to instances where the witness actually receives a tangible benefit in exchange for testimony. A witness can have bias resulting from benefits he may subjectively expect or hope to receive, whether or not those perceived benefits are grounded in reality. *See State v. Cox*, 87 Or App 443, 448, 742 P2d 694 (1987) (explaining that a witness can be biased by even the possibility of a future benefit, which can directly affect the witness's credibility).

Smith's statements to officers clearly show that he subjectively hoped that he would receive a benefit related to his custody issues for his testimony against petitioner. Given the timing of the statements, it appears that Smith did not believe that possible benefits from providing testimony against petitioner were limited by his previously-negotiated plea and sentence. Indeed, Smith's statements show that he believed that he could still receive assistance with his custody case, plea notwithstanding. That subjective hope provided a possible motivation to have fabricated petitioner's incriminating statements. It therefore directly went to Smith's credibility.

Petitioner's trial counsel believed that after the prosecution established that Smith received no benefit for

his testimony, there was nothing to be gained by otherwise questioning Smith's testimony. That was incorrect. The prosecution's line of questioning related to the lack of any *actual* benefit. That issue was wholly different and apart from Smith's *subjective hope* that his testimony could be exchanged for a future favor in his custody case. Neither side questioned Smith about his personal interest in testifying as it related to his hope that he may be able to exchange his cooperation for help in obtaining custody of his children. Contrary to trial counsel's reasoning, there was a benefit to directly impeaching Smith using his statements during interviews. It would have demonstrated Smith's possible expectation of a future favor in exchange for his testimony; a well-recognized basis for impeachment. *See State v. Hubbard*, 297 Or 789, 801, 688 P2d 1311 (1984) (determining that an officer's motive to avoid future departmental sanctions was relevant impeachment evidence); *State v. Presley*, 84 Or App 1, 5, 733 P2d 452 (1987) (explaining that a witness's subjective hope of a favor with a pending theft charge was valid impeachment evidence).

Respondent argues that directly impeaching Smith would have introduced the risk of giving Smith an opportunity to testify that he came forward out of a "moral obligation." But we cannot consider that potential reason for trial counsel's decision not to impeach Smith where nothing in the record indicates that trial counsel himself appreciated that risk. *Delgado-Juarez v. Cain*, 307 Or App 83, 96, 475 P3d 883 (2020). Just because, upon reflection, either respondent or this court could identify a number of considerations that may have justified trial counsel's decision not to impeach Smith, we may not engage in *post hoc* rationalization in a manner that does not reflect "'counsel's actual strategic reasoning.'" *Farmer*, 363 Or at 698 (quoting *Montez*, 355 Or at 27); *Montez*, 355 Or at 27 ("We agree, of course, that courts may not indulge in *post hoc* rationalizations of trial counsel's decisions that contradict the evidence derived from their actions."). That is, we may not "simply disregard" the fact that trial counsel's decision was based in part on an inaccurate understanding of the potential benefits just because there was "other accurate information that the attorney considered or may have considered." *Farmer*, 363 Or at 699.

Trial counsel's testimony before the post-conviction court does not reflect that avoiding another opportunity for Smith to bolster his credibility was an actual risk that he considered. There is no indication that trial counsel believed impeaching Smith using his expectation of a favor in his custody case would backfire on petitioner or carry any specific risk. Instead, as detailed above, trial counsel's testimony shows that he believed there was no point to impeaching Smith on any ground where there was no evidence of an actual benefit to Smith's plea or sentence. To consider that trial counsel had any risks in mind despite there being no evidence of those risks in his testimony would constitute impermissible *post hoc* rationalization.[1]

Because the rationale that counsel relied on did not reflect a reasonably accurate understanding of the benefits of impeaching Smith by using his hope for a favorable outcome in his custody case, counsel's decision to avoid directly questioning Smith's motives is not a tactical decision that reflects the "appropriate consideration of the risks and benefits" described in *Farmer*. In a case where the state primarily relied on an inmate informant to prove the charges against A, adequate counsel would have accurately assessed that the benefits of impeaching Smith based on his subjective belief that someone would later owe him a favor in his custody case outweighed the already-realized risks. Given that trial counsel did not conduct an appropriate cost-benefit analysis that accurately reflected either the potential benefits or risks of impeaching Smith, the post-conviction court erred in concluding that he exercised the professional skill and judgment that Article I, section 11, requires.

B.   *Prejudice*

To prove prejudice, a petitioner has to show that trial counsel's failure to impeach Smith "could have tended to affect the outcome of the case." *Green v. Franke*, 357 Or

---

[1] Further, even if we were to consider the superintendent's alternative consideration, the risk that Smith may bolster his own credibility while testifying had already been realized. During defense counsel's own cross-examination of Smith, Smith testified that he "came forward with the information because [he] felt [he] had an obligation to do that." Respondent's rationalization of trial counsel's reasoning as avoiding that risk is therefore not rooted in the record.

301, 323, 350 P3d 188 (2015) (internal quotation marks and emphasis omitted). The "tendency" to affect the outcome standard "demands more than mere possibility, but less than [a] probability" that trial counsel's error could have affected the ultimate outcome. *Id.*; *see also Davis*, 303 Or App at 276 (explaining that the prejudice question involves whether the deficient performance affected the ultimate outcome of the proceedings). Whether the error had a tendency to affect the factfinder's verdict is determined through an assessment of other evidence pertaining to the issue, considered in light of the issues at trial in their entirety. *Cunningham v. Thompson*, 188 Or App 289, 296, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004).

We review the post-conviction court's prejudice determination for errors of law, and our role is to make "a legal conclusion about the likely effect of the error on the verdict, not a finding about how the court views the weight of the evidence of the defendant's guilt." *Mitchell v. State of Oregon*, 300 Or App 504, 515, 454 P3d 805 (2019) (internal quotation marks omitted). "[I]n conducting our analysis, we must be aware of the distorting effect of hindsight, which includes a risk of confirmation bias, that is, a risk that, in hindsight, there may be a tendency to view counsel's errors as having had no effect on what may seem to have been an inevitable or foreordained outcome." *Id.* (internal quotation marks omitted).

Upon review of the record, Smith's credibility was central to the prosecution in proving the counts related to the sexual abuse of A. At trial, A could not remember much about the night of March 22, 2000, other than that she was at the home where the alleged events took place and that she was assaulted by an older male. Although another witness present at the home, E, identified petitioner as the male who sodomized A, the trial court explicitly recognized that Smith's statements were critical to the state's case against petitioner. The trial court acknowledged that A's testimony alone "was insufficient to prove anything other than her presence at the party on March 22, 2000," but that "her testimony *combined with that of others* to prove some of the charges that concerned her." (Emphasis added.) The trial court then "[s]pecifically" relied on "the testimony of Craig

Smith," who the trial court found "to have been very brave in his decision to come forward and reveal what he learned from [petitioner's] own lips while they were in jail together."

As discussed above, Smith was never impeached by trial counsel with his subjective belief or hope that his testimony might result in favorable treatment in his custody case. Instead, the only evidence presented to the trial court was that Smith's plea and sentence were not affected by his testimony. Trial counsel's introduction of additional inmate witnesses also focused on the unlikelihood that petitioner would have trusted Smith with details of his crimes, rather than any possible self-interest on the part of Smith. There was therefore no evidence presented to the trial court about Smith's possible self-interest in testifying against petitioner.

Where Smith's testimony and credibility were central to the trial court's guilty verdicts on the counts involving A, evidence suggesting that Smith came forward out of self-interest rather than a "moral obligation" may well have affected the weight given to Smith's testimony by the trial court. Ultimately, it is more than a mere possibility that it would have made a difference to the trial court's guilty verdict on those counts. Accordingly, we reverse and remand the post-conviction court's denial of petitioner's first claim for relief as related to trial counsel's failure to impeach Smith.

Reversed and remanded as to claim regarding trial counsel's failure to impeach Smith; otherwise affirmed.